# THE IROQUOIS.

## CERTIORARI TO THE UNITED STATES CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 200. Submitted March 18, 1904.—Decided May 2, 1904.

While a master is not bound in every instance where a seaman is seriously injured to disregard every other consideration, and put into the nearest port where medical assistance can be obtained, his duty to do so is manifest, if the accident happens within a reasonable distance of such a port.

The duty of the master in each case depends upon its own circumstances, and although the case may not be free from doubt this court will apply its general rule both in equity and admiralty cases, not to reverse the concurring decisions of two subordinate courts upon questions of fact unless there be a clear preponderance of evidence against their conclusion.

THIS was a libel filed in the District Court for the Northern District of California by Matthew Bridges against the ship Iroquois, to recover damages for a failure of the master to provide suitable surgical treatment and care for the libellant, who had suffered injury by a fall from the main yard to the deck of the vessel.

The facts of the case were substantially as follows: The Iroquois left New York on December 27, 1899, bound for the port of San Francisco, with a full cargo of general merchandise. On February 23, 1900, while the vessel was rounding Cape Horn during heavy weather, and while libellant was aloft in the performance of his duty, he accidentally fell from the main yard to the deck of the vessel, thereby fracturing two ribs and his right leg in two places. The master, with the aid of the carpenter, set the leg in splints, kept the libellant in his berth, gave him such food and delicacies as the supplies of the ship permitted, and on March 30, after five weeks, removed the splints, and found the leg apparently in good condition. Before arriving at San Francisco, and early in April, he was able to leave his berth, go upon deck and walk about with the aid of

a crutch. But after arriving at that port on May 7, 1900, he was sent to the hospital, where it was found that, while his ribs had healed perfectly, the bones of his leg had not united, and he was subsequently, and in October, compelled to suffer amputation, and, of course, became a cripple for the remainder of his life. The master was charged with a breach of duty in failing to put into an intermediate port and procure the proper surgical attendance.

Upon this state of facts the District Court entered a decree in favor of the libellant for $3,000, 113 Fed. Rep. 964, which was subsequently affirmed by the Court of Appeals. 118 Fed. Rep. 1003.

*Mr. Milton Andros* for petitioners, cited *The Osceola,* 189 U. S. 150, 175; *The Scotland,* 42 Fed. Rep. 925; Art. XIX, Laws of Wisby; *Reed* v. *Canfield,* 1 Sum. 202; *The City of Alexandria,* 17 Fed. Rep. 395; *Peterson* v. *The Chandos,* 4 Fed. Rep. 645, distinguishing *Brown* v. *Overton,* 1 Sprague, 462; *Danvir* v. *Morse,* 139 Massachusetts, 323; *Olsen* v. *Whitney,* 47 C. C. A. 331.

*Mr. A. H. Ricketts, Mr. Walter G. Holmes* and *Mr. D. T. Sullivan* for respondent, cited *Brown* v. *Overton,* 1 Sprague, 462; S. C., Fed. Cas. 2024; *Scarff* v. *Metcalf,* 107 N. Y. 211, 216; *Peterson* v. *The Chandos,* 4 Fed. Rep. 645; *Robertson* v. *Baldwin,* 165 U. S. 287; *Burgess* v. *Equitable Marine Ins. Co.,* 126 Massachusetts, 70, and cases cited on p. 80; *Perkins* v. *Augusta Ins. Co.,* 10 Gray, 312; *Tomlinson* v. *Hewitt,* 2 Sawyer, 278; *The Osceola,* 189 U. S. 158, 175; *The Troop,* 118 Fed. Rep. 769; *Danvir* v. *Morse,* 139 Massachusetts, 323.

MR. JUSTICE BROWN, after making the foregoing statement, delivered the opinion of the court.

The duty to provide proper medical treatment and attendance for seamen falling ill or suffering injury in the service of the ship has been imposed upon the shipowners by all maritime

nations.　It appears in the earliest codes of Continental Europe and was expressly recognized by this court in the recent case of *The Osceola,* 189 U. S. 158.　Upon large passenger steamers a physician or surgeon is always employed, whose duty it is to minister to the passengers and crew in cases of sickness or accident.　Of course, this would be impracticable upon an ordinary freighting vessel, where the master is presumed to have some knowledge of the treatment of diseases, and in ordinary cases stands in the place of a physician or surgeon, *The Wensleydale,* 41 Fed. Rep. 602; but for the further protection of seamen, vessels of the class of the Iroquois are compelled by law to be provided with a chest of medicines and with such anti-scorbutics, clothing and slop-chests as the climate, particular trade and the length of the voyage may require. Compiled Stat. secs. 4569, 4572, 4573.

What is the measure of the master's obligation in cases where the seaman is severely injured while the ship is at sea has been made the subject of discussion in several cases; but each depends so largely upon its own particular facts that the rule laid down in one may afford little or no aid in determining another, depending upon a different state of facts.　The early cases of *Harden* v. *Gordon,* 2 Mason, 541, and *Reed* v. *Canfield,* 1 Sumner, 195, contain an exhaustive discussion of the general subject by Mr. Justice Story.　But, as in both cases the disability occurred at or near a port, they are of no special value in this case.

We have carefully examined the cases of *Brown* v. *Overton,* 1 Sprague, 462; *Peterson* v. *The Chandos,* 4 Fed. Rep. 645; *The Scotland,* 42 Fed. Rep. 925; *Whitney* v. *Olsen,* 108 Fed. Rep. 292; *The Troop,* 118 Fed. Rep. 769, and *Danvir* v. *Morse,* 139 Massachusetts, 323, and are of opinion that none of them fits the exigencies of the present case.　We cannot say that in every instance where a serious accident occurs the master is bound to disregard every other consideration and put into the nearest port, though if the accident happen within a reasonable distance of such port, his duty to do so would be manifest.

Each case must depend upon its own circumstances, having reference to the seriousness of the injury, the care that can be given the sailor on shipboard, the proximity of an intermediate port, the consequences of delay to the interests of the ship-owner, the direction of the wind and the probability of its continuing in the same direction, and the fact whether a surgeon is likely to be found with competent skill to take charge of the case. With reference to putting into port, all that can be demanded of the master is the exercise of reasonable judgment and the ordinary acquaintance of a seaman with the geography and resources of the country. He is not absolutely bound to put into such port if the cargo be such as would be seriously injured by the delay. Even the claims of humanity must be weighed in a balance with the loss that would probably occur to the owners of the ship and cargo. A seafaring life is a dangerous one, accidents of this kind are peculiarly liable to occur, and the general principle of law that a person entering a dangerous employment is regarded as assuming the ordinary risks of such employment is peculiarly applicable to the case of seamen.

To judge of the propriety of the master's conduct in a particular case we are bound so far as possible to put ourselves in his place, and inquire whether, in view of all the circumstances, he was bound to put into an intermediate port. The charge in the libel is that he should either have put back to Port Stanley in the East Falkland Islands, or deviated from his course and made the port of Valparaiso, "or any one of several other ports in the southern part of South America." The very indefiniteness of this charge shows that neither libellant nor counsel had in mind any particular port, and it was not until the testimony of a former officer of the Chilian navy was taken at San Francisco, that they were able to fix upon the port of San Carlos or the Evangelist Islands as proper places at which to make call. In view of this inability to select a proper port until the officer whose business it had been to cruise up and down the Chilian coast had informed them, it may certainly be contended

with great show of reason that the master was not bound to know of the existence of these ports, except as he was informed by the chart, or of the possibility of obtaining surgical treatment at them. While masters plying upon vessels between New York and Pacific ports would be presumed to know of such familiar harbors as those of Port Stanley and Valparaiso, it by no means follows that they are chargeable with knowledge of every port upon the southwest coast of South America, or of their surgical facilities. The accident occurred upon one of the loneliest and most tempestuous seas in the world. For over one thousand miles from Cape Horn to Valparaiso there seem to have been but one or two places at which it would be feasible to make a call. The evidence shows that the ship at the time was about 480 miles from Port Stanley, and with the winds then prevailing it would have been possible to reach that port in three or four days, but that to return to the place of the accident in view of the head winds might have taken as many weeks. During this time the owners of the ship would sustain a heavy loss in the wages and provisions of the crew, and the demurrage of the ship, and while the cargo is not shown to have been perishable, there would be a risk of the loss of a market by the consequent delay in reaching San Francisco. The master is not chargeable with fault in failing to put back to Port Stanley.

It was also suggested that the ship could have made the Evangelist Islands, at the western end of the Straits of Magellan, by sailing one or two days out of her course; but it was shown that the only building there was a light-house, from which a small steamer was accustomed to put out to passing vessels in case a signal for relief was hoisted, and that nothing could be done there, except possibly to place the seaman upon a steamer bound north to Valparaiso or east to Sandy Point, near the middle of the straits. The probability of obtaining aid by this course, and the certainty of the limb being injured by the delay, would have made it highly inadvisable to adopt it. As there is no harbor in the islands, the various transfers

from the ship to a boat and from the boat to shore, and the return to another ship in the rough water that might be expected at that point, would have been extremely dangerous to a person in libellant's crippled condition. The transfer of passengers from a ship to a boat, even in a moderate sea, is attended with considerable difficulty, and, to a person with a broken leg, with great danger, in view of the unequal rising and falling of a large ship and a small boat. Had the master adopted this course and injury had resulted to the libellant, he could hardly have escaped the imputation of negligence.

The libellant contended in his brief that, assuming that the master was not in fault for failing to stop at the Evangelist Islands, he should have put in at the port of San Carlos or Ancud, which lie near together, where it seems there is a good harbor, a city of 15,000 or 20,000 inhabitants, and ample surgical facilities. We are not impressed with the force of this argument. These are not harbors at which vessels from the Atlantic and Pacific ports are in the habit of stopping. While the master was apprized by his charts of their existence, it might well be that he was ignorant of the population and of the accommodations for disabled seamen. There was no American consul there, and quite possibly no one familiar with the English language. To convict the captain of negligence for not calling there it must be shown that he knew or should have known that the libellant could obtain proper treatment. In short, the suggestion of these ports appears to have been purely an afterthought, inspired by the testimony of the Chilian officer.

With respect to Valparaiso, the case is different. This port appears to be about 1,500 miles from the place of the accident, and, with favorable winds, could have been reached in 14 days. It is true that the direct course from Cape Horn to San Francisco passes Valparaiso at a distance of about 600 miles; but the testimony all shows that if the Iroquois had borne away and hugged the South American coast she might have put into

Valparaiso, left the libellant there, and resumed her course without more than five or six days' detention. Valparaiso is a large city, with ample hospital facilities, and with an American consul general resident there.

We have no criticism to make of the treatment of libellant immediately following the injury, except that we think he should have been taken into the cabin, where he could have been more comfortably provided for. His leg was put in splints as well as the master and carpenter knew how to do it; he was kept to his berth in the forecastle and was fed with such delicacies as the ship's supplies afforded. No fever set in, and when the splints were taken off, about five weeks after the accident, and after the vessel had passed Valparaiso, the leg was found to be in good condition, except for certain sores which had broken out upon it, caused by the long confinement in splints. It is true the libellant said the bones were not united, but he does not seem to have complained of this to the master; yet with a careful examination, such as the master was bound to make, we think he should have detected it. It may be, however, that the bones failed to unite by reason of the libellant being allowed to go upon deck and walk about on crutches. But however this may be, it was admitted that when the splints were taken off the vessel was about as near San Francisco as Valparaiso, and that nothing would have been gained by turning about at that time.

The real question in the case is: whether the master, knowing his ignorance of surgery, the serious nature of the libellant's injury, the poor accommodations for him in the forecastle, the liability of inflammation setting in, and of the bones not uniting, the fact that he was to be carried through the tropics, where to an invalid confined in the forecastle the heat would be almost intolerable, he should not, even at the sacrifice of a week, have put into Valparaiso and left the libellant there in charge of the American consul. Upon the other hand: libellant made no complaint of his treatment; did not ask to be taken into an intermediate port, and, so far as appears, the master

did not know that the wound was not healing properly. The fact that the ribs had already united probably induced him to believe that the leg had also healed, although a careful examination could not have failed to reveal the truth. We lay no stress upon the fact that the libellant did not ask to be taken into an intermediate port. He was a boy, largely ignorant of his rights and duties. The master was his legal guardian in the sense that it is a part of his duty to look out for the safety and care of his seamen, whether they make a distinct request for it or not. If, on arriving at Valparaiso, the bones were found not to have knitted together, there was at least a chance of securing their union by proper treatment. If, upon the other hand, they had united there was a certainty of securing ultimate recovery by careful nursing, and by the use of facilities which the hospital undoubtedly would have, and which the ship undoubtedly had not. To put it in a light most favorable to the master, he speculated upon the chance that the union of the bones had taken place without seeking to inform himself of the fact. The courts below held that the master did not discharge, as he should have done, the claim of humanity which the serious nature of the injury and the helpless condition of the libellant imposed upon him.

Upon the whole, while the case is by no means free from doubt, we are not disposed to disturb the decree of the court below in holding it to have been the duty of the master to put into an intermediate port. We regard the case as peculiarly one for the application of the general rule so often announced by this court, both in equity and admiralty cases, that this court will not reverse the concurring decisions of two subordinate courts upon questions of fact, unless there be a clear preponderance of evidence against their conclusions. *The S. B. Wheeler,* 20 Wall. 385; *The Lady Pike,* 21 Wall. 1, 8; *The Richmond,* 103 U. S. 540; *Towson* v. *Moore,* 173 U. S. 17; *Smith* v. *Burnett,* 173 U. S. 430, 436.

As the decision of the District Court was unanimously af-

firmed by the Circuit Court of Appeals, we do not think there is any such preponderance of evidence as would justify us in disturbing their conclusions. The decree is therefore

*Affirmed.*