## THE MARGHARITA.

### BOERO v. MARTINEZ.

(Circuit Court of Appeals, Fifth Circuit. October 26, 1905.)

### No. 1,421.

SEAMEN—INJURY IN SERVICE—CARE AND TREATMENT BY VESSEL.

Libelant, a seaman on a barkentine bound, with cargo from a Chillian port to Savannah, Ga., when off the west coast of South America near Cape Horn, fell into the sea and his leg was bitten off by a shark. He was rescued and given such treatment and care on board as was possible, and the vessel proceeded on her voyage, reaching Savannah in a little less than three months, where libelant was sent to a hospital. It was found that the leg had healed; but an amputation was necessary on account of the condition of the bones, and it was successfully performed. The nearest known port to the place of the accident at which surgical treatment could have been obtained was Port Stanley, Falkland Islands, to reach which would have required at least 23 days, because of the distance, the season, which was winter, and the prevailing winds. Libelant's wound was kept dressed; the vessel having a medicine chest. Hemorrhage and fever subsided in about four days, and he continued thereafter to improve. *Held*, that under the circumstances the master was not chargeable with negligence which would render the vessel liable in not sailing for Port Stanley or putting into an intermediate port.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Seamen, § 39.]

Appeal from the District Court of the United States for the Southern District of Georgia.

This was a libel in rem filed by Juan de la Cruz Silva Martinez against the Italian bark Margharita to recover damages for personal injuries sustained and suffering endured by him while a seaman on board the vessel. Negligence of the master and officers was charged. The case resulted in a decree for the libelant for the sum of $1,500, from which this appeal was taken. The facts making the case are stated in the opinion.

Saml B. Adams, for appellant.

William B. Stubbs and Walter G. Charlton, for appellee.

Before PARDEE, Circuit Judge, and NEWMAN and MEEK, District Judges.

MEEK, District Judge. On the 23d day of July, 1903, Martinez, the appellee, sailed in the bark Margharita, as a seaman, from Pisagua, in the republic of Chile, on a voyage to Savannah, Ga. On the 15th day of August, 1903, at half past 10 o'clock in the evening, when the bark was in the region of latitude 34° 35′ south and longitude 91° west of Greenwich, he was sent aloft to assist in reefing a sail. While aloft about this work he lost his footing and was precipitated into the sea. He was rescued by his fellow sailors, and when hauled onto the deck it was found that while in the water his left leg had been bitten off about four inches below the knee by a shark or some other marine monster. The vessel did not deviate from its course, but continued on its voyage to Savannah, where it arrived on November 11, 1903.

The record does not disclose sufficient evidence to support appellee's first ground of complaint as set forth in the libel, to the effect that he was thrown into the sea and received his injury because of the negligent manner in which the yardarm, upon and about which he had to work in reefing the sail, was fastened. There is much evidence that the yardarm was held by proper fastenings in a steady and taut position, as it should have been. The sailor who jumped overboard and rescued appellee from the deep soon afterward went aloft and made fast the foreroyal, the work appellee started to do, and he testifies the yardarm was secure and in order. The evidence of the appellee upon this subject is unsatisfactory and inconclusive, leaving the mind in doubt as to the cause and manner of his fall and as to the place from which he fell. We conclude, with the trial judge, that the accident resulting in the loss of appellee's leg must be attributed to the ordinary perils of navigation, the risk of which he assumed, and that therefore there can be no recovery on this ground.

The second ground of complaint relates to the duty of the master of the vessel to appellee after the happening of the accident, and presents a more serious and difficult question. The libel charges, in substance, that the master of the bark, in view of the accident to appellee and his consequent suffering, was in duty bound to provide him at the earliest moment possible with surgical aid; and, there being no surgeon or other person competent to deal with the emergency on board the bark, it became the duty of the master to put into the nearest port where such aid could be obtained; that the course of the bark lay in the direction of the Falkland Islands, and that the master should have put into Port Stanley in those islands, and, if not, then into one of the many ports lying intermediate between Port Stanley and Savannah, Ga., where surgical aid could have been obtained. Mr. Justice Brown, in The Iroquois, 194 U. S. 240, 24 Sup. Ct. 640, 48 L. Ed. 955, says:

"The duty to provide proper medical treatment and attendance for seamen falling ill or suffering injury in the service of the ship has been imposed upon the shipowners by all maritime nations. It appears in the earliest codes

of continental Europe and was expressly recognized by this court in the recent case of The Osceola, 189 U. S. 158, 23 Sup. Ct. 483, 47 L. Ed. 760. Upon large passenger steamers a physician or surgeon is always employed, whose duty it is to minister to the passengers and crew in cases of sickness or accident. Of course, this would be impracticable upon an ordinary freighting vessel, where the master is presumed to have some knowledge of the treatment of diseases, and in ordinary cases stands in the place of a physician or surgeon (The Wensleydale [D. C.], 41 Fed. 602); but for the further protection of seamen vessels of the class of the Iroquois are compelled by law to be provided with a chest of medicines and with such anti-scorbutics, clothing, and slop chests as the climate, particular trade, and length of the voyage may require. U. S. Comp. St. 1901, pp. 3100–3102, §§ 4569, 4572, 4573."

The evidence locates the Margharita at the time of the accident off the west coast of South America, and about to round Cape Horn. Because of the distance and the prevailing winds, it would have taken her at least 23 days to have come into the region of the Falkland Islands. The bark was provided with a chest of medicines, with appropriate antiseptic dressings for wounds, with bandages, and with the necessary instructions for the use of these things. The acute conditions resulting from the amputation or biting off of appellee's leg were serious. Hemorrhage, swelling, inflammation, and fever followed. The hemorrhage was checked and controlled within four days by placing the stump in tar. The symptoms of septic infection soon disappeared. The fever lasted but three or four days, and thereafter his temperature was normal. The logbook of the vessel shows this, and it finds support in the evidence of the appellee. He says about four days after the accident, when he was not feeling so very bad, he took a small map of the world which he had, and by the aid of information secured from the sailors he made calculations as to where the vessel was at the time of the accident. This would indicate the subsidence of both hemorrhage and fever. The wound was regularly cleansed and bound in linen, with antiseptic applications. By direction of the master the man on watch regularly attended him and supplied his wants. He was provided a diet of light edibles, broth, and teas suitable to a person in his condition.

Only one action of the master in his treatment of the wounded seaman while on board the vessel is subject to criticism. He was placed in a cabin forward in the vessel and adjoining the water-closet. While the evidence discloses this fact, it is not shown that his location caused any special discomfort or added to his suffering. It would, however, have been more in harmony with his treatment in other regards, as well as more considerate and humane, to have given him a more favorable and cheerful location. After the expiration of 26 days the appellee began going on deck, where he sat at times for as much as six hours. Upon the arrival of the vessel at quarantine off Savannah, he was immediately sent to the hospital on the quarantine boat. There it was found that the soft parts of his leg had healed, leaving the bones exposed and protruding beyond the soft parts, which had contracted somewhat in the healing process. The exposed ends of the bones were in a necrotic condition. About one and one-half inches, or enough of the leg to secure what is termed a surgical flap, was amputated. The result obtained was satisfactory, and according to the surgeon who performed the operation and testified for appellee

he now has a fairly good stump. The surgeon also testified appellee's general condition of health was good upon his arrival at the hospital; that he was not debilitated, as he stood the operation well and rallied well. Further, it was his opinion, and it is manifest to the common understanding, that an additional amputation would have been necessary, had the bones of libelant's leg not been cut or bitten off even with the soft parts, unless surgical aid had been soon at hand after the accident and before the bones should get in a necrotic condition.

From this review of the history of the case, certain deductions can safely be drawn. Before surgical aid could have been obtained by putting into Port Stanley in the Falkland Islands, the nearest available point, the acute and dangerous stage resulting from the injury had passed. Before that port could have been reached the healing processes of nature were under way and had made progress. Putting into Port Stanley, or any other port intermediate between the place of the accident and Savannah, would not have avoided the necessity of an additional amputation. No permanent loss or disability was occasioned by the long delay in securing surgical aid. The appellee's leg was gone, and all that a surgeon could do was to put it in condition to heal properly with the soft parts covering the ends of the bones. Therefore, the only injury resulting from the delay was the prolongation of the suffering occasioned by the healing wound. With these conditions obtaining as to the appellee, was the master bound to deviate from his course and put into Port Stanley? The measure of a master's obligation to a seaman who is severely injured with the ship at sea is discussed by Mr. Justice Brown in The Iroquois, supra. He says:

"We cannot say, in every instance where a serious accident occurs, the master is bound to disregard every other consideration and put into the nearest port, though, if the accident happened within a reasonable distance of such port, his duty to do so would be manifest. Each case must depend upon its own circumstances, having reference to the seriousness of the injury, the care that can be given the sailor on shipboard, the proximity of an intermediate port, the consequences of delay to the interests of the shipowner, the direction of the wind and the probability of its continuing in the same direction, and the fact whether a surgeon is likely to be found with competent skill to take charge of the case. With reference to putting into port, all that can be demanded of the master is the exercise of reasonable judgment and the ordinary acquaintance of a seaman with the geography and resources of the country. He is not absolutely bound to put into such port if the cargo be such as would be seriously injured by the delay. Even the claims of humanity must be weighed in a balance with the loss that would probably occur to the owners of the ship and cargo. A seafaring life is a dangerous one, accidents of this kind are peculiarly liable to occur, and the general principle of law that a person entering a dangerous employment is regarded as assuming the ordinary risks of such employment is peculiarly applicable to the case of seamen."

It is not shown the master knew of Port Stanley and its facilities for caring for the wounded, and no competent evidence was given as to these. The Supreme Court holds that masters plying upon vessels between New York and Pacific ports would be presumed to know of such familiar harbors as those of Port Stanley and Valparaiso. The Iroquois, supra. But it is not shown that the master of the Margharita ever plied upon any vessel around Cape Horn between any Atlantic American and Pacific ports. Whether, in view of the very

general dissemination of information concerning world points and harbors and the consequent increasing exactions upon those who follow the sea, this presumption of knowledge should be held as well to pertain to and include masters of itinerant vessels and tramp ships, we do not deem necessary now to determine. The vessel's cargo was nitrate of soda, not perishable. The accident occurred upon "one of the loneliest and most tempestuous seas in the world," and in winter. The making of an unknown harbor would have been fraught with uncertainty, and possibly with difficulties of navigation. The delay incident to a deviation from the course and stoppage would have been of somewhat indefinite duration. During this time the owners of the bark would sustain heavy loss in the wages and provisions of the crew and the demurrage of the bark.

We have examined the cases cited by appellee in support of the contention the master should have put into some intermediate harbor to; secure surgical aid and relief, and it is worthy of note that in each of them, where this was held to be the duty of the master, permanent injuries and disabilities resulted from his failure to pursue this course. This is also true of all the reported cases that have come under our observation. See the Iroquois, supra; Brown v. Overton, 1 Spr. 462, Fed. Cas. No. 2,024; The Chandos (D. C.) 4 Fed. 645; Whitney v. Olsen, 108 Fed. 292, 47 C. C. A. 331; The Troop (D. C.) 118 Fed. 769. In The Erskine M. Phelps, 131 Fed. 1, 65 C. C. A. 239, it was held the master of the vessel was not negligent in failing to put back to Port Stanley to secure surgical aid for a seaman who received an injury in which both bones of his leg below the knee were broken, and who for want of expert surgical assistance may have suffered a permanent shortening of his leg. In that case the ship was within 540 miles and four days' sail of the port; but the ship was shorthanded, it was midwinter, and it was shown that, because of the hazardous nature of the entrance to Port Stanley, vessels made that harbor only as a last resort and in cases of dire necessity.

Having in contemplation the whole case, and especially considering that the appellee received all the care and attention from the master and his fellow seamen it was possible to give on a freighting ship, that he was not caused any additional permanent injury by reason of the delay in the treatment of his leg, that because of the failure to make Port Stanley or some intermediate port he simply experienced a prolongation of such suffering as would result from a healing wound, and that he finally received efficient and successful surgical aid at the expense of the bark at Savannah, we conclude that the master is not chargeable with fault or neglect in failing to deviate from his course to procure such aid.

The decree is reversed, and the cause remanded to the District Court, with instructions to dismiss the libel.

NOTE. The following is the opinion of the court below:

SPEER, District Judge. The remarkable facts in view of which the libel is filed in this case are as follows: The libelant, Juan de la Cruz Silva Martinez, is a Chilian sailor, and was in the service of the Italian bark Margharita. On a voyage from Pisagua, Chile, to Savannah, he was sent aloft at night to

reef one of the sails. Through some means, alleged by him to be the negligence with which the yard was fastened, he lost his footing and fell overboard. A member of the crew, Massimo Chiesa, an Italian, very bravely sprang overboard to his assistance and succeeded in supporting Martinez until a rope was thrown, when both were hauled aboard. As soon as the libelant reached the deck it was found that a "shark or other marine monster," to use the language of the libel, in the brief interval in which he had remained in the water, had bitten off his leg a few inches below the knee. The bark proceeded on her voyage to Savannah, which was a distance of about 7,000 miles from the point where the accident above narrated occurred. After that city was reached, Martinez brought his libel, ascribing his injuries to the negligence of the master and officers of the bark and seeks damages therefor.

The first assignment of negligence is that he had the right to rely on the fact that the yardarm was held taut, in a steady position, by the usual ropes and appliances for that purpose; that he had no reason to suspect that it was not properly secured; that he had no opportunity to avoid the effect of a sudden lurch of the vessel, which threw him into the ocean; that he did not contribute in any way to the accident; and that, had the yardarm been secure in its proper position, he would not have been injured. With regard to this assignment the court is not at all satisfied, in view of the testimony, that it is supported by the evidence. There is much evidence to the effect that the yard was properly secured. We are also convinced from the evidence that the libelant himself does not know how he came to fall, and so far as that feature of the case is involved we are also convinced that the accident is probably ascribable to one of the ordinary perils of navigation, and it follows that no recovery can be had on this ground.

The second assignment is that the master of the bark, well knowing the terrible pain which libelant was suffering, the danger to his life from said injury, the loss of blood which had ensued, and the shock which necessarily followed, was in duty bound to see that the libelant was furnished at the earliest moment with competent and effective medical and surgical treatment, there being no surgeon on said bark or any person with knowledge or experience to deal with such emergencies; that it was the imperative duty of said master to proceed with all dispatch to the nearest port where libelant could receive proper attention; that libelant, knowing his critical condition and the further danger to him in crossing the tropics in such a condition, besought the master to land him at the nearest port or to place him on some passing steamer. In connection with the same assignment it is alleged that the bark was distant at the time of the accident only about 300 miles from Port Stanley in the Falkland Islands, that her course lay in the direction of said islands, and that Port Stanley could have been reached in about 72 hours. It is also alleged that there are numerous other towns along the coast of South America, in Cuba, Hayti, and Florida, where libelant could have received surgical treatment; but in the opinion of the court it is not essential to consider the averments with regard to ports other than Port Stanley. It is further alleged that, instead of stopping at the nearest port where libelant could receive prompt and intelligent surgical treatment, in disregard of the tortures which he was hourly undergoing and the grave peril to life which resulted therefrom, the master did not touch any port until he reached his destination at Savannah on November 11, 1903. The injury having occurred on August 15th, it appears that nearly four months of suffering were endured by the libelant before he had proper surgical treatment. He alleges that the only treatment received by him was the application of such rude appliances as ropes and bits of sheets and shirts and a salve of unknown composition. He alleges that he suffered indescribable pain, and that when he reached Savannah his leg was in a horrible condition, the tibia protruding from the flesh for two inches or more, and the flesh, muscles, and tissues being in a decomposed condition, involving further risk to the libelant's life, and necessitating a further amputation, which has been made. He alleges that this great and continued suffering was gratuitous, and inflicted upon him by the failure of the master to land him at Port Stanley.

The grounds of defense to this feature of the libelant's claim are that the course of the Margharita was not to the west of the Falkland Islands, but was to its eastward some 150 miles; that sailing vessels do not ordinarily go be-

tween the Falkland Islands and South America; that the libelant made a contract to go to Savannah; that there was a medicine chest on board; that the leg was properly bound up, the flow of blood was stopped, and it was properly, dressed; that libelant received all needed and proper attention; that on account of the ship and the condition of the winds it would have consumed months to have taken the libelant to any port; and that under the law of Italy and by the dictates of humanity this was not required. It is denied that the libelant besought the master of the ship to land him at the nearest port or place him on some passing steamer. On the contrary, he expressed himself as entirely satisfied with what was being done for him and expressed the desire to be taken to Savannah. It is alleged that at the time the accident occurred that the bark was not within 300 miles of Port Stanley but was about 17 days distant, or about 1.800 or more miles therefrom, and that it would have been a dangerous thing for a sailing vessel to have gone to the Falkland Islands at this time.

The law upon this subject is clearly settled. In the case of The Troop, 118 Fed. 769 (District Court of the District of Washington), where on a British ship a seaman fell to the deck and fractured the bones of his thigh and arm, and where, instead of sending libelant to the hospital, the captain undertook to reduce the fractures, and then sent libelant to his bunk in the forecastle and continued the voyage, giving him no further attention until reaching another port, 36 days later, it was held that the captain was guilty of gross inhumanity and violation of duty imposed on him by libelant's contract for service, which rendered the ship liable in damages for libelant's suffering and permanent injury. The court assessed damages at $4,000. In the case of Whitney v. Olsen, 108 Fed. 292, 47 C. C. A. 331, when 500 miles from Port Townsend, a sailor who had signed for a cod-fishing cruise was struck by the main boom, without fault on the part of any one, and his leg was broken in two places. There was no surgeon on board, nor any one competent to treat the injury. Libelant asked to be taken to shore, but the master proceeded to Unalaska, 1,750 miles from the place of injury, which he reached in 16 days, and from that port libelant was sent back to San Francisco. It was in that case held that it was the duty of the master under the facts shown to at once proceed to Port Townsend, which was the nearest available port where libelant could have received proper care and treatment, and that his failure to do so rendered the owners liable in damages. This case was decided by the Circuit Court of Appeals of the Ninth Circuit, Gilbert and Ross, Circuit Judges, and Hawley, District Judge.

A case singularly like that at bar is The Iroquois, 118 Fed. 1003, 55 C. C. A. 497. This also was decided by the Circuit Court of Appeals of the Ninth Circuit upon appeal from the District Court of the United States for the Northern District of California. There the appellee was an able-bodied seaman, one of the crew of the American ship Iroquois, on a voyage from New York to San Francisco. On February 23, 1900, while assisting in furling the mainsail during a gale, he accidentally, and without fault of his own or fault of the ship, fell from the mainyard to the deck, and sustained a fracture of two ribs and of both bones of his right leg below the knee. The vessel was then a few miles to the southward of Cape Horn, not distant from the point where Martinez was injured. The appellee was carried to carpenter's room, where the master set his leg in splints. He was then removed to the forecastle, where he remained during the remainder of the voyage. The vessel proceeded to San Francisco, arriving there on May 7, 1900. (This voyage was in duration a month shorter than that Martinez was compelled to endure.) Appellee was sent to the marine hospital. There it was found necessary to amputate his leg about three inches below his knee. The master of the Iroquois had no skill or experience in treating fractures. It appears that he set appellee's leg as well as he could and bound it and placed it upon a cushion, in order to elevate it above the body, and instructed the steward to give the appellee gruel, mush, and other light food. Appellee made no complaint of the treatment. The District Court found, and held under the circumstances of the case as disclosed by the evidence, that it was the absolute duty of the master of the ship to deviate from the course

of the voyage for the purpose of procuring surgical aid for the appellee, and that the master was guilty of negligence in failing so to do. This finding was affirmed by that Circuit Court of Appeals which perhaps has had more opportunity to acquire experience in maritime law as affecting sailing vessels than any other save that having jurisdiction in New York. Circuit Judge Gilbert, in rendering the opinion of the court, observes: "We entertain no doubt, in view of the evidence in the case and the law applicable thereto, that it was the duty of the master to bear away to some port of distress as soon as possible after the occurrence of the accident. There were several ports to which the appellee might have been taken for surgical treatment. The vessel could have returned to Port Stanley, the chief port of the East Falkland Islands. The District Court found that to have returned there would have involved a loss of time of three or four weeks, and in so finding made, we think, more than liberal allowance for probable delay and adverse winds." The court further holds: "It is no excuse that the master was ignorant, or that he believed the broken leg was healing properly, nor that the appellee made no complaint of the treatment. The duty of the master to the appellee was a positive one. In Robertson v. Baldwin, 165 U. S. 287, 17 Sup. Ct. 331, 41 L. Ed. 715, Mr. Justice Brown, referring to the protection accorded to seamen, observed that they are treated 'as needing the protection of the law in the same sense in which minors and wards are entitled to the protection of their parents and guardians.' The appellee had been disabled while in the service of the ship, and without any fault on his part. By the maritime law he was entitled to be healed at the expense of the ship. This obligation was imposed upon the ship in consideration of the appellee's services, and his undertaking to engage in possibly perilous voyages, and encounter hazards, if necessary, in the protection of the ship and cargo. The injury to the appellee was a serious one, and the master must be presumed to have known that it required careful and scientific treatment."

This case has been reviewed in an instructive opinion by Mr. Justice Brown for the Supreme Court of the United States reported in June number, 1904, of the Advance Sheets, Lawyers' Co-operative Publishing Company, p. 640 et seq. Upon the measure of the master's obligation where a seaman is severely injured while the ship is at sea, the learned justice remarks: "We cannot say that in every instance where a serious accident occurs the master is bound to disregard every other consideration and put into the nearest port, though, if the accident happens within a reasonable distance of such port, his duty to do so would be manifest. Each case must depend upon its own circumstances, having reference to the seriousness of the injury, the care that can be given the sailor on shipboard, the proximity of an intermediate port, the consequences of delay to the interests of the shipowner, the direction of the wind, and the probability of its continuing in the same direction, and the fact whether a surgeon is likely to be found with competent skill to take charge of the case. With reference to putting into port, all that can be demanded of the master is the exercise of reasonable judgment and the ordinary acquaintance of a seaman with the geography and resources of the country. He is not absolutely bound to put into such port if the cargo be such as would be seriously injured by the delay. Even the claims of humanity must be weighed in a balance with the loss that would probably occur to the owners of the ship and cargo. A seafaring life is a dangerous one, accidents of this kind are peculiarly liable to occur, and the general principle of law that a person entering a dangerous employment is regarded as assuming the ordinary risks of such employment is peculiarly applicable to the case of seamen." The court proceeds, in substance, to hold that the duty of the master of the Iroquois to put back to Port Stanley or to deviate from his course to San Carlos or the Evangelist Islands is very indefinite, remarking: "While masters plying upon vessels between New York and Pacific ports would be presumed to know of such familiar harbors as those of Port Stanley and Valparaiso, it by no means follows that they are chargeable with knowledge of every port upon the southwest coast of South America or of their surgical facilities." It appearing that the prevailing winds were unfavorable to making Port Stanley his port of distress, he was held not chargeable with fault in failing to put back to Port Stanley. "With respect to

Valparaiso," said the learned justice, "the case is different. This port appears to be about 1,500 miles from the place of the accident, and with favorable winds could have been reached in 14 days. It is true that the direct course from Cape Horn to San Francisco passes Valparaiso at a distance of about 600 miles; but the testimony all shows that if the Iroquois had borne away and hugged the South American coast she might have put into Valparaiso, left the libelant there and resumed her course without more than five or six days' detention. Valparaiso is a large city, with ample hospital facilities." The court also holds that no criticism was to be made of the treatment of the libelant, except it was thought that he should have been taken into the cabin, where he could have been more comfortably provided for. "The real question in the case is," said Justice Brown, "whether the master, knowing his ignorance of surgery, the serious nature of the libelant's injury, the poor accommodations for him in the forecastle, the liability of inflammation setting in and of the bones not uniting, the fact that he was to be carried through the tropics, where to an invalid confined in the forecastle the heat would be almost intolerable, he should not, even at the sacrifice of a week, have put into Valparaiso and left the libelant there in charge of the American consul." No importance is attached to the fact that the libelant made no complaint of his injuries, and none to the contention that he did not ask to be taken into an intermediate port. The master was held under the circumstances to be as if his legal guardian. Holding that the case was not entirely free from doubt, the decree of the court below holding that the master should have put into Valparaiso to secure aid for the seaman, was affirmed.

This deliverance seems to be authoritative as to the duty of this court in the case now before it. Taking the testimony of the master of the Margharita as conclusive, his vessel was as close to Port Stanley as was the Iroquois to Valparaiso. The deviation to Port Stanley from his course would not have been so great as that of the Iroquois to the Chilean city. According to other testimony he was in a very short distance of Port Stanley and this we believe to be true. As in the case of the Iroquois, he knew that he must cross the tropics. There could be no doubt of the grave seriousness of the injury, none that he was unable to give the wounded sailor the proper care. The consequences of delay to the interests of the shipowner must have been trivial. The direction of the wind was favorable and continuous. A competent English surgeon would certainly have been found in the marine hospital at Port Stanley. That port is in a healthful climate and is widely known as a harbor to which vessels experiencing calamities of one sort and another in rounding Cape Horn repair for assistance. As far back as the date of the latest publication of the Encyclopædia Britannica it is stated that as many as 50 vessels a year put in there on account of injuries. The British government keeps up a considerable military post at that point. How much stronger, then, is the case against the master of the Margharita than against the master of the Iroquois. It is not difficult to conceive the unspeakable agony—indeed, torture—which the libelant must have experienced in his long voyage of more than 7,000 miles to Savannah with the ragged extremity of his cruelly wounded leg incased at times in a box of hot tar and at other times rudely bandaged by the kind, but inexperienced, hands of his shipmates. According to his own testimony his sufferings were so great that he often lost consciousness. This seems to have been inevitable from the nature of his injury and the terrible shock to body and mind it must have occasioned. According to the testimony of the physician in Savannah, his leg was in a lamentable condition when he reached that port. It is indispensable that in cases of serious injuries to seamen, or in case of their dangerous sickness, that in order to obtain proper surgical or medical assistance for them, the courts of admiralty, which proceed ever upon the broadest principles of humanity and justice, should enforce the reasonable rules so frequently announced by the courts, and as we have seen so clearly stated in the opinion of the Supreme Court in Re The Iroquois, supra. Such is the duty of the courts, not only to compensate the seaman for his unnecessary and unmerited suffering when the duty of the ship is disregarded, but to emphasize the importance of humane and correct judgment under the circumstances on the part of the master.

Under the circumstances we feel constrained to render a decree in favor of the libelant and assess his damages at $1,500.