## THE C. S. HOLMES.

(Circuit Court of Appeals, Ninth Circuit. February 1, 1915.)

No. 2402.

1. SEAMEN ⊙═29—ACTION FOR INJURY—LIABILITY OF VESSEL IN REM.
   A vessel is not liable in rem to a seaman for an injury alleged to have been caused by a negligent order of the master directing libelant in the performance of his duties.
   [Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 186, 188–194; Dec. Dig. ⊙═29.]

2. SEAMEN ⊙═11—INJURY IN SERVICE—FAILURE TO FURNISH PROPER MEDICAL TREATMENT AND CARE.
   The master of a vessel represents the owner in respect to the duty of the owner to furnish care and maintenance to an injured seaman, and a libel which alleges that, after libelant was injured in course of his duty, the master refused to take him to a marine hospital, which was at no great distance, but instead took him to another port, and left him with a doctor, with no arrangement for payment, states a cause of action in rem against the vessel.
   [Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 39–44, 187; Dec. Dig. ⊙═11.]

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

Suit in admiralty by Gust Fondahn against the schooner C. S. Holmes. From an order sustaining exceptions to amended libel, libelant appeals. Reversed in part.

For opinion below, see 212 Fed. 525.

Daniel Landon, of Seattle, Wash., for appellant.

Richard A. Ballinger, Alfred Battle, Robert A. Hulbert, and Bruce C. Shorts, all of Seattle, Wash., for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. The court below sustained exceptions to the first two counts of the amended libel, and its ruling in that regard is the ground of the present appeal.

---

The first count is as follows:

"That during the month of December, 1912, the libelant signed articles as an able seaman to make a trip on board the schooner C. S. Holmes from San Francisco, Cal., to Everett, Wash., and return, at $45 per month. That while on the return voyage, and while performing his duty as a seaman, on the 3d of January, 1913, in the afternoon, a heavy storm arose, and the ship sought shelter in Neah Bay. A tug was sent out to look at the condition of the weather, and came back and reported that it was not fit for any vessel to go out on account of the mountain of sea running at 12 o'clock noon. With the weather conditions unchanged the steamer Goliah gave the said C. S. Holmes a steel cable of 5 inches thickness, which was taken on board and made fast on the forward end of the said ship by being placed three times around a square bitt; and by order of the captain of the said ship C. S. Holmes the steamer Goliah towed her to sea, it taking the steamer 7 hours to tow the C. S. Holmes a distance of 8 miles. That at about 7 o'clock, and while weather conditions were unchanged, the said steamer blew her whistle to let go the wire; the captain of the Holmes gave general orders for everybody to go forward and take hold of the wire; the crew held back; when they received the orders the second time, everybody went forward, but none went to the wire, except the libelant; the captain was standing about 4 feet above the libelant, where he could see everything going on, libelant being in a position where he could not see the condition of the wire; libelant inquired of the captain how the wire was on the bow, and he was told by the captain that the wire was slack, and that everything was all right, and to let go; and libelant let go the lashings and went away as quickly as possible to avoid danger. The wire was tight, and sprang back, and hit libelant, causing a compound fracture of libelant's right arm, paralyzing and bruising his side."

The exceptions to the foregoing are to the effect that the allegations thereof are not sufficient to constitute a cause of action, nor to bring it within the jurisdiction of admiralty.

The second count is in these words:

"That the captain gave orders to go back to Port Angeles. Libelant requested to be taken to Port Townsend to the marine hospital, but was informed that it would cost $100 to do so, and that there was a marine doctor at Port Angeles, and so refused. They arrived at Port Angeles at 3 o'clock in the morning. The libelant again requested to be taken to Port Townsend to the marine hospital, and the captain again refused. At about 7 or 8 o'clock the captain took libelant to Dr. Taylor, wrote out a permit, gave it to the said doctor, informing him at the same time that it was good for all expenses incurred. The said doctor asked the captain to explain the permit. The captain then told him: 'I have nothing to explain. The man is in your care now, and he is out of my hands'—at the same time laughing at the doctor in a manner that would indicate that he had knowingly deceived him. The captain knew all the time that there was no marine doctor at Port Angeles, and that the permit was valueless for any purpose, other than to be used for admission at the Port Townsend marine hospital. The captain deliberately put libelant off at Port Angeles for the purpose of getting rid of him, knowing and intending that he would at most only receive temporary relief; at the same time he knew, or should have known, that libelant needed prompt and permanent attention on account of the condition of his injuries. That the libelant was taken to the office of the doctor, and in the presence of the captain an attempt was made by the then unwilling doctor to fix him up temporarily, which was not successful, and two days later, while libelant was still in a helpless condition, the doctor requested the libelant to leave. Libelant was unable to move. He received no more attention or treatment for six days longer, when with considerable effort he made his way to Port Townsend. During the time he was at Port Townsend blood poison set in, and after two months' treatment at the marine hospital at Port Townsend an attempt was made to set the bones, but the ends of the bones so broken had commenced to decay by reason of treatment being neglected when injured,

and the arm was in such condition that the plates used to hold the bones together broke loose and the bones are still continuing to decay."

To this the exceptions are as follows:

"That this action, instituted by a seaman in rem against a vessel to recover damages for improper treatment of personal injuries sustained by him at sea, by a physician at a port to which the vessel put to obtain medical and surgical attendance for him, is not an admiralty and maritime cause of action, and is not within the jurisdiction of this honorable court. That libelant has no cause of action against the vessel for damages alleged to have resulted from improper treatment of personal injuries sustained as alleged in the libel, by a physician at a port to which the vessel put back to obtain medical and surgical attendance for him, as alleged in the libel."

[1] Undoubtedly the libel is not well drawn, but courts of admiralty are always liberal in the construction of pleadings, especially as against seamen, whose lives at best are hard, and who are often spoken of as wards of the court. But as a matter of course no court can create a liability where none exists under the law; and so, in respect of the first of the two counts here presented for consideration, it is impossible to hold it sufficient. It rests simply upon the allegation to the effect that from where the libelant stood he could not see "how the wire was on the bow," and that the captain could see from his position, and that, when the libelant had inquired of the captain concerning the matter, he was told that the wire was slack, and that everything was all right, and to let go, which the libelant thereupon did, resulting in his injury. Manifestly that was a matter relating solely to the ordinary navigation of the vessel.

In The Osceola, 189 U. S. 158, 23 Sup. Ct. 483, 47 L. Ed. 760, the questions considered and determined by the Supreme Court were whether "the vessel was liable in rem to one of the crew by reason of the improvident and negligent order of the master in directing the hoisting of the gangway for the discharge of cargo, before the arrival of the vessel at her dock, and during a heavy wind." The court, after a full review of English and American authorities upon the questions, announced the settled law to be as follows:

"1. That the vessel and her owners are liable, in case a seaman falls sick, or is wounded, in the service of the ship, to the extent of his maintenance and cure, and to his wages, at least so long as the voyage is continued.

"2. That the vessel and her owner are, both by English and American law, liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship. Scarff v. Metcalf, 107 N. Y. 211, 13 N. E. 796, 1 Am. St. Rep. 807.

"3. That all the members of the crew, except perhaps the master, are, as between themselves, fellow servants, and hence seamen cannot recover for injuries sustained through the negligence of another member of the crew, beyond the expense of their maintenance and cure.

"4. That the seaman is not allowed to recover an indemnity for the negligence of the master, or any member of the crew, but is entitled to maintenance and cure, whether the injuries were received by negligence or accident."

In the case of Olson v. Oregon Coal & Navigation Co. (decided by this court) 104 Fed. 574, 44 C. C. A. 51, we held in effect that the owner of a ship which has exercised due care in making her seaworthy for a voyage, in her equipment and supplies, and the selection of her

officers and crew, cannot be held responsible for the proper performance of the details of navigation during the voyage, and is not liable for an injury received by a member of the crew through the negligence of an officer or another member in leaving a hatchway open; the navigation of the ship during the voyage being a common undertaking, for which all the ship's company in their several stations are employed, and in respect of which they are regarded by the maritime law, as well as the common law, as fellow servants. In that case, as in the present one, there was no averment in the libel tending to show that the ship was not properly equipped with all necessary and proper appliances, or that she was not properly manned, or not entirely seaworthy, or that there was any neglect on the part of the owner in the selection of the officers or crew of the ship. In the course of the opinion (104 Fed. 575, 44 C. C. A. 52), it was said:

"The owner, who is usually ashore, and in this case was a corporation, cannot, in the nature of things, see to the details of navigation. The officers and crew are employed for that purpose, and it would be quite as reasonable to hold the owner responsible for the negligent handling of a rope or sail as for the failure to close a hatch. It is undoubtedly true that the master represents the owner in respect to the personal duties and obligations which the latter owes to the seamen, such, for instance, as the maintenance of the ship and her supplies, the supplying of the crew with sufficient food and with medical attendance and care in case of injury or sickness, and for his neglect in any of those particulars the owner is liable."

We are therefore of the opinion that the court below was right in its ruling regarding the first count of the amended libel.

[2] Not so, however, in respect to the second count; for, although it is not very clear or positive in its averments, still, in view of the liberal rule that prevails in admiralty in respect to pleadings, enough, we think, appears to show that the injured libelant was not accorded by the master of the schooner the treatment to which he was entitled under the law.

The injuries sustained by him were a compound fracture of his right arm and injuries to his side. Obviously therefore, what he needed were the services of a competent surgeon, if one was within reasonable reach. The accident occurred near Cape Flattery at about 7 o'clock in the evening; further up the straits was Port Townsend, at which there was a marine hospital, and towards which the schooner was proceeding, and to which the injured seaman requested the captain to take him. According to his allegations the captain refused the request, telling the libelant that to do so would cost $100, and that there was a "marine doctor at Port Angeles," back to which place he turned, reaching there about 3 o'clock in the morning, when the libelant again requested to be taken to Port Townsend, to the marine hospital, which request was again refused. Instead, at about 7 or 8 a. m., the captain took the libelant ashore—

"to Dr. Taylor, wrote out a permit, gave it to the said doctor, informing him at the same time that it was good for all expenses incurred. The said doctor asked the captain to explain the permit. The captain then told him: 'I have nothing to explain. The man is in your care now, and he is out of my hands.'"

It is alleged that the captain knew at all the times in question that there was no marine doctor at Port Angeles, and that the permit was valueless for any purpose, except for the admission of the libelant to the marine hospital at Port Townsend, and that the captain deliberately put the libelant off the schooner at Port Angeles for the purpose of getting rid of him, knowing and intending that he would at most only receive there temporary relief; that in the office of Dr. Taylor and in the presence of the captain "an attempt was made by the then unwilling doctor to fix him [libelant] up temporarily, which was not successful, and two days later, while libelant was still in a helpless condition, the doctor requested the libelant to leave," which he was unable to do, and that he received no more attention or treatment for six days longer, after which he made his way to Port Townsend.

For the purpose of disposing of the exceptions, those averments are, of course, to be taken as true. So taken, it cannot, in our opinion, be properly held that the vessel is without liability. Assuming the competency of the doctor at Port Angeles, the effect of the allegations is not only that he was not employed by the captain to give to the injured seaman proper medical care, but, on the contrary, that the captain gave to the doctor a written paper informing him that "it was good for all expenses incurred," while at the same time well knowing that it was valueless for any purpose except that of the admission of the libelant to the marine hospital at Port Townsend, which averments are supported by the further allegation that the captain deliberately put the libelant ashore at Port Angeles "for the purpose of getting rid of him, knowing and intending that he would at most only receive temporary relief," and that even that was not accorded him. Of course, no such tricks are sanctioned by the admiralty or any other law. That it is the duty of the owner of a vessel to furnish an injured seaman with proper medical care, and that the master represents the owner with respect to that duty is well settled—each case depending upon its own circumstances. See The Iroquois, 194 U. S. 240, 24 Sup. Ct. 640, 48 L. Ed. 955.

In so far as concerns the exceptions to the second count of the amended libel, the order appealed from is reversed, with directions to overrule the exceptions thereto, and with leave to answer.