**HOLLIDAY v. PACIFIC ATLANTIC S. S. CO.**

No. 10596.

United States Court of Appeals Third Circuit.

Argued April 8, 1952.

Decided June 27, 1952.
Rehearing Denied Oct. 6, 1952.

Abraham E. Freedman, Philadelphia, Pa. (Henry A. Wise, Jr., Wilmington, Del., on the brief), for appellant.

Thomas E. Byrne, Jr., Philadelphia, Pa. (William Prickett, Wilmington, Del., Krusen, Evans & Shaw, Philadelphia, Pa., on the brief), for appellee.

Before MARIS, GOODRICH, and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

The widow of Clinton Holliday, as his administratrix, instituted this libel, pursuant to the Jones Act, 46 U.S.C.A. § 688, charging Pacific Atlantic Steamship Company with legal responsibility for the death of Holliday, a seaman, who was fatally stricken while serving as chief cook during a foreign voyage of respondent's steamship, "Peter Kerr". After full hearing the district court found that the evidence failed to establish any breach of duty owed Holliday by the respondent. Accordingly, judgment was for respondent and libellant has appealed.

It is not disputed that Holliday died of blood poisoning which developed on shipboard and terminated fatally in a hospital in Capetown, South Africa, ten days after the seaman had been removed from respondent's ship directly to the hospital. Libellant attempted to show that negligence of respondent or the unseaworthiness of its vessel caused Holliday, during the course of his shipboard duties, to suffer a traumatic leg injury which, in turn, resulted in fatal septicemia. The district court concluded that libellant's proof fell short of establishing such fault on the part of respondent. We share the district court's view that the evidence on this phase of the case was weak and unconvincing. The finding against the party who bore the burden of proof was proper and we now sustain it.

But, also in issue is the question whether respondent failed in its duty to provide reasonable medical care for Holliday after he became ill, from whatever cause, and for that reason must respond in damages for his death. A review of the relevant evidence is necessary.

The "Peter Kerr" arrived at Port Elizabeth, South Africa on February 2. The ship remained in port until the afternoon of February 5, when it sailed for Capetown. It arrived and anchored in the roadstead off Capetown shortly after 7 p.m. on February 7. It docked early the following morning, February 8. A doctor came on board shortly after noon and promptly had Holliday removed to the Capetown hospital where he died February 18.

It is not disputed that Holliday complained of an injured leg or ankle about the time the ship reached Port Elizabeth. Testimony for the respondent as to the course of events thereafter comes from the master of the vessel and the second mate, who served as medical officer, there being no physician on board.

The second mate's testimony was to the effect that at no time did Holliday's injury or complaint seem very serious. The mate related a voyage long history of sores and abrasions on Holliday's legs which did not heal normally. He hazarded the view that Holliday probably had "bad blood"; though,

reminded that Holliday was employed and retained as ship's cook, he construed this opinion as relating to diabetes. As for the particular complaint made while the ship was in Port Elizabeth, the mate viewed it as the old trouble, aggravated perhaps by bad whiskey and constipation, or even a sprain. The mate says he had a doctor from Port Elizabeth aboard on February 5 to look at several men, including Holliday although the mate was not present at the time of this medical visit. All he knows is that the doctor prescribed some pills.

The following day, February 6, while the ship was at. sea the mate observed that Holliday's leg had begun to swell. In his medical log he entered: "swelling was supposed to be caused by sprained ankle and was treated accordingly". He also called the master to look at the patient. The master remembers no swelling but remembers recommending routine applications of "soap liniment". He says Holliday worked that day. The mate does not remember any further observation until the morning of February 8. The master's account of the events of that morning is as follows:.

"Q. And immediately upon arriving at Capetown you called a shore doctor? A. The Second Officer said that Holliday had then gone to bed and his legs were swollen somewhat, so then I did go down myself and saw—I saw his legs in the morning there and I did call the doctor for him and several other crew members."

In all this evidence, master and mate were at great pains to make it clear they had no indication of critical or even dangerous illness. Even the calling of a doctor at Capetown is made to appear the precaution of a careful ship, rather than a measure of emergency.

But there is other testimony. Joseph Cooper, a member of the crew and, according to established labor relations procedure, liason between the steward's department and the ship's officers, says that as early as the evening the ship left Port Elizabeth Holliday was bedridden and delirious, and his ankle showed "a big pus on the side and black like water in it". Cooper says

he had reported Holliday's condition to the mate from time to time, during these early days of February and that on the day of departure from Port Elizabeth the captain said he would summon a doctor when they reached Capetown. He denies the history of chronic leg sores.

Such conflicting accounts remind us that the testimony of the ship's officers at one extreme and the crew's delegate at the other, may minimize or exaggerate occurrences out of solicitude for the interest served. We must search further for objective and unbiased testimony. Before doing so, however, we note one glaring contradiction in the ship's story. It has already been observed that the testimony of captain and mate creates the impression that Holliday's condition did not appear too serious even on February 8. Yet the mate's medical record for that day, which also is in evidence, shows this entry:

"C. Holliday, Cook; pain in left leg; soap liniment; leg was swollen to twice its normal size; soaked in epsom salt solution."

Here is the first striking indication that Holliday's condition must have appeared much worse at the time than the officers would concede later.

But the convincing and illuminating picture of the sick man's condition on February 8 is supplied by an independent medical witness, Dr. Shapiro, whom the captain had summoned that morning routinely, through the ship's agent, and who examined and hospitalized Holliday. Dr. Shapiro deposed:

"He [Holliday] had an intensely swollen left leg with underlying cellulitis and had large blisters. He was irrational and delirious and also was suffering from Septicemia.

"I reported to the ship's agent that the man should be detained for treatment.

"He was removed from the ship to the Somerset Hospital on February 8, 1942.

"He was treated with sulphonamide products as penicillin was not available in those days, but went steadily

down-hill and became comatose later on. His kidneys showed evidence of poisoning (Nephritis) and he died of cardiac failure at four o'clock in the morning of the eighteenth."

The physician was also asked whether the condition he observed could have developed between February 5 and February 8, assuming that a medical examination on the earlier date revealed no serious condition. He replied:

" * * * virulent spread of infection and a development of cellulitis and septicemia might have occurred between February 5, 1942 and the time when I first examined Mr. Holliday on February 8, 1942. My opinion is that I find it difficult to believe that in so short a time, the leg would have become so swollen."

In the light of this testimony of an attending physician called by the ship's agent, we are unable to believe the testimony of captain and mate. The ship reached the roadstead at Capetown about 7 p.m., February 7. Before that time it must have been apparent even to a lay observer that Holliday's leg was very badly infected and that his condition was serious and worsening. The mate, deemed to have sufficient specialized knowledge to serve as medical officer, should at least have appreciated and been gravely alarmed by the likelihood and imminent danger of blood poisoning, although he could make no certain diagnosis. To him and to the captain the urgency of attendance by a physician at the earliest possible time should have been clear. Yet procedure was merely routine. No effort was made to have a physician brought out to board the ship when she arrived in the Capetown roadstead or immediately thereafter. Fifteen or more hours were wasted in obtaining a physician to attend a man who obviously needed immediate medical attention. This was negligence, a serious dereliction of duty owed the seaman by the operator of the vessel. Cf. The Iroquois, 1904, 194 U.S. 240, 24 S.Ct. 640, 48 L.Ed. 955.

Of course, it cannot be said with certainty that Holliday would have lived had a physician been summoned during the early evening of February 7. We do know that treatment beginning the afternoon of February 8 was too late to arrest the spread of infection and poisoning. In the words of the attending physician, "He went steadily downhill". Moreover, respondent must maintain the position that when the ship left Port Elizabeth Holliday's leg was not badly infected. Otherwise, it would have been negligence not to have removed him from the ship then and there. So respondent must insist that within a critical period of three days or less a slight infection developed into septicemia too advanced to be arrested. In the light of this chronology, it is a proper conclusion that, had Holliday been hospitalized and treated fifteen hours earlier during this short critical period the likelihood of arresting the infection and saving his life would have been greatly increased. Respondent's neglect deprived him of this chance and, therefore, is properly regarded as a legally responsible cause of death.

Concluding that libellant was entitled to judgment, we shall vacate the judgment of the district court and remand the cause with directions to determine the amount of libellant's damage and to enter judgment accordingly.