Alejandro CRUZ, Plaintiff,

v.

AMERICAN EXPORT ISBRANDTSEN
LINES, INC., Defendant.

No. 65 Civ. 2895.

United States District Court,
S. D. New York.

March 5, 1970.

Abraham E. Freedman, New York City, for plaintiff; C. Sovel, S. B. Gruber, New York City, of counsel.

Dougherty, Ryan, Mahoney, Pellegrino & Giuffra, New York City, for defendant; R. Giuffra, New York City, of counsel.

## OPINION

TENNEY, District Judge.

This is a suit in admiralty commenced by plaintiff under the Jones Act, 46 U.S. C. § 688, to recover damages for injuries sustained while employed aboard the "S. S. FLYING CLIPPER", a vessel owned and operated by the defendant corporation. Plaintiff alleged to the Court, sitting without a jury, that his injuries were sustained by reason of the negligence of defendant's agents and the unseaworthiness of its vessel. Post-trial memoranda were submitted by the parties, and, at the Court's request, proposed findings of fact and conclusions of law were also submitted. Having heard the testimony, examined the record and exhibits, and having carefully considered counsel's supporting briefs and applicable authority, the Court makes the following determinations.

*Findings of Fact.*

1. Plaintiff is an American seaman.

2. Defendant is a corporation engaged in the steamship business with an office and principal place of business in New York City.

3. Defendant owned and operated the S.S. FLYING CLIPPER at all times relevant herein.

4. On the 10th of April, 1965, plaintiff "signed-on" defendant's vessel as an able-bodied seaman. He was employed in this capacity for three voyages commencing April 10, 1965 and terminating September 3, 1965.

5. Plaintiff took a pre-sign-on physical examination given by defendant's doctor and was found fit for duty.[1]

6. On August 30, 1965, while the S.S. FLYING CLIPPER was docked in San Juan, Puerto Rico, plaintiff returned to the vessel in an intoxicated condition.

7. Prior to and during the time the alleged injury was sustained, plaintiff was inebriated due to his consumption of large quantities of rum.[2]

8. After the chief officer found plaintiff in this condition, he went to inform the Master of the situation.

9. The chief officer and Master returned and found Cruz "ranting and raving", irrational and still intoxicated.[3]

10. Plaintiff was not violent and did not attempt to strike the chief officer or the Master. Neither the Master nor anyone else was threatened by Mr. Cruz.[4]

11. While under the influence of alcohol, Cruz refused the Master's order to go to the ship's hospital.

12. Upon such refusal, the Master sent the chief officer to get steel handcuffs. The chief officer was then ordered to apply the handcuffs to the plaintiff's wrists.[5]

13. After the handcuffs were applied, Cruz calmed down and went compliantly to the hospital where he was placed in bed.[6]

14. He again began to rant and rave, and, in order to contain him, he was shackled to the hospital bunk with an additional pair of handcuffs.[7]

15. Before manacling plaintiff the Master did not try gentler means of restraint, either chemical or physical, nor did he consult the manual Ship's Medicine Chest and First Aid at Sea.[8]

16. The Master ordered the chief officer to keep Mr. Cruz under constant surveillance, but made no attempt to see whether this order was carried out.[9]

17. Cruz was first left alone for fifteen minutes, after which time the chief officer returned for a brief period to observe him.[10]

18. The chief officer again left plaintiff alone for between 20 and 30 minutes,[11] during which time he looked for an ordinary seaman to station as a guard. However, when one was not found, no substitute was sent.[12]

19. Upon the chief officer's return to the hospital, he noted that the plaintiff's left wrist was red and swollen.[13]

20. Prior to this time, plaintiff had not complained of injury to his left wrist, nor was any injury observed by the chief mate when he applied the handcuffs.

21. Plaintiff had no previous difficulty with either the Master or the chief officer, and had performed his duties without incident.

22. When the chief officer noticed the condition of Cruz's left wrist, he removed the handcuffs, gave him phenobarbital and returned Cruz to his room.[14]

1. Pg. 2. Tr. 10–11; Plaintiff's Exh. 1.

2. Pg. 2. Tr. 36–38, 43, 54, 55, 78, 81.

3. Pg. 3. Tr. 127, 132–33.

4. Pg. 3. Tr. 80, 134.

5. Pg. 3. Tr. 83–84, 127–28.

6. Pg. 3. Tr. 86–87; 97–99.

7. Pg. 3. Tr. 19–20, 87–88, 129.

8. Pg. 4. Tr. 138; Plaintiff's Exh. 7.

9. Pg. 4. Tr. 136.

10. Pg. 4. Tr. 88, 104–05.

11. Pg. 4. Tr. 88–89.

12. Pg. 4. Tr. 105.

13. Pg. 4. Tr. 89, 105.

14. Pg. 5. Tr. 89, 106, 108.

23. Plaintiff's injuries were sustained while he was left manacled to the side of the bed without guard or surveillance.[15]

24. The chief officer and Master had previous experience with intoxicated persons.

25. While plaintiff was in the hospital no other methods of restraint or sedation were used.[16]

26. The manual Ship's Medicine Chest and First Aid at Sea was not consulted during the entire incident even though it was acknowledged to be the authoritative book put out by the United States Public Health Service.[17]

27. On September 3, 1965, after docking in New York aboard the S.S. FLYING CLIPPER, plaintiff reported to the United States Public Health Service Outpatient Clinic, where his condition was diagnosed as a displaced fracture of the navicular bone of the left wrist.[18]

28. Plaintiff was transferred to the United States Public Health Service facility in San Juan, Puerto Rico, and was disabled until May 3, 1966, when he was declared fit for duty.[19]

29. The plaintiff has suffered and will continue to suffer pain and discomfort and limitation of motion as a result of the injury sustained.[20]

30. The fracture has never united and the plaintiff remains partially, permanently disabled.[21]

31. Plaintiff has a permanent surgical scar on his left wrist.

32. A displaced fracture of the navicular bone would have been discovered in a pre-sign-on physical examination.[22]

#### Discussion

Considering the wealth of seamen's injury litigation in the federal courts, there is unfortunately a conspicuous lack of authority on the proper treatment and reasonable care to be afforded seamen who become derilect in duty and boisterous in conduct while under the influence of alcohol. Nevertheless, predicated on the facts as I have found them to be, it must be determined whether the manner in which defendant's agents treated Cruz was negligent under the circumstances present, and, if so, whether the injuries sustained by him were reasonably foreseeable and the proximate result of defendant's negligence.

■ It is undisputed that "[t]he duty to provide proper medical treatment and attendance for seamen falling ill or suffering injury in the service of the ship has been imposed upon the shipowners by all maritime nations." The Iroquois, 194 U.S. 240, 241–242, 24 S.Ct. 640, 48 L.Ed. 955 (1904). In addition, the master of a freight vessel is often deemed to stand in the place of a physician or surgeon. The Iroquois, *supra* at 242, 24 S.Ct. 640. However, in determining the reasonableness of the care and treatment provided a seaman, special attention should be given to the exigencies presented in each situation. Further, the court should always be mindful of the inherent limitations of shipboard treatment by a non-physician, and before passing judgment on the master's conduct, it should, as far as possible, put itself in the master's place by giving due recognition to the existing circumstances under which the master has acted. See The Iroquois, *supra* at 243, 24 S.Ct. 640.

■■ There is no doubt that metal restraints may properly be used under certain circumstances. If a seaman *wilfully* disobeys a lawful command at sea, he may be punished by being placed in irons. 46 U.S.C. § 701. However, a seaman as intoxicated as Cruz could hardly have been capable of wilful dis-

---

15. Pg. 5. Tr. 87, 89, 105, 129.

16. Pg. 5. Tr. 135–36, 142.

17. Pg. 5. Tr. 138.

18. Pg. 5. Tr. 44–45, 189; Plaintiff's Exh. 2 at 5; Plaintiff's Exh. 3 at 17.

19. Pg. 6. Tr. 45, 47; Plaintiff's Exh. 3.

20. Pg. 6. Tr. 200–01, 209, 261–62.

21. Pg. 6. Tr. 202–03, 211, 261.

22. Pg. 6. Tr. 210.

obedience of an order. The testimony offered at trial reveals that Cruz had been drinking heavily for two days prior to the injury, was "ranting and raving", and had just consumed a pint of rum prior to being shackled.[23] Such circumstances clearly negate the possibility of producing conscious or wilful disobedience.

■■ Further, if the conduct of a seaman appears to be physically or mortally dangerous to others aboard a vessel, it is obviously justifiable for a captain to place the seaman in irons. In Dantzler v. Defender Shipping Co., 285 F.Supp. 541, 545 (E.D.Pa.1968), aff'd, 411 F.2d 792 (3rd Cir. 1969), plaintiff threatened the life of three seamen and held a knife to the neck of another. The Court properly concluded that a jury could have found the Master's decision to put the plaintiff in leg-irons entirely reasonable under the circumstances. Similar threats of violence are absent from the instant suit.[24] In Escandon v. Pan American Foreign Corp., 12 F.Supp. 1006 (S.D.Tex.1935), aff'd, 88 F.2d 276 (5th Cir. 1937), the district court dismissed a libel for injuries sustained as a result of handcuffing, because the handcuffs were applied as a precautionary measure to prevent plaintiff from injuring or interfering with the crew and vessel and because "[n]o more force was used than libelant made necessary." I find no credible evidence that the S.S. FLYING CLIPPER, its crew or its cargo, were in any danger from plaintiff, which finding is supported by the testimony of the Master of that vessel.[25] Further, I find that much more force was used than was reasonably necessary under the circumstances.

■ A seaman who, because of inordinate intoxication, becomes uncooperative and boisterous, should not immediately be shackled to a bunk with two sets of irons, and then left unattended. The immediate use of metal handcuffs is unreasonable, and the gravity of this wrong is compounded by leaving the inebriate unattended.

■ At trial, it was conceded that the Ship's Medicine Chest and First Aid at Sea [26] is the authoritative book to be consulted for medical problems,[27] and that it is the Master's duty to care for the welfare and safety of his crew.[28] This duty, no doubt, includes the care of intoxicated seamen. Assuming that Cruz was suffering from nothing more than acute drunkenness, the initial use of steel handcuffs was unjustified. Although in treating acute drunkenness no specific treatment is prescribed in the Ship's Medicine Chest and First Aid at Sea, it is suggested that if the patient is not easy to control "he should be put in his bunk, covered warmly enough to prevent chilling. * * * He should be watched from time to time until sure that his condition is not serious." [29] The Master admitted that none of the above-listed comforts was offered to plaintiff before he was shackled.[30] This was unreasonable, for while some discretion is necessarily left with the Master in caring for intoxicated seamen, he is not given carte blanche to shackle a "drunken seaman" to a bunk and leave him unattended while "ranting and raving".

■ Even if physical restraints were warranted, just as in the treatment of delirium, they should have been applied with as little force as possible and with "kindness and consideration",[31] since they "are dangerous and tend to antagonize or irritate the patient, and should * * * be used only when absolutely necessary." [32] "Constant supervision of restrained patients should be

23. Pg. 8. *Supra* notes 2 and 3.

24. Pg. 8. *Supra* note 4.

25. Pg. 9. Tr. 134.

26. Pg. 9. Plaintiff's Exh. 7.

27. Pg. 9. Tr. 138.

28. Pg. 9. Tr. 139.

29. Pg. 10. Plaintiff's Exh. 7 at 308.

30. Pg. 10. Tr. 135–36.

31. Pg. 10. Plaintiff's Exh. 7 at 289.

32. Pg. 10. *Id.* at 290.

maintained." [33]  Although the above-quoted language is subscribed under the heading "DELIREUM", [34] it is equally applicable to the treatment of acute drunkenness in situations where restraint is necessary.  Common sense dictates that mechanical restraints be avoided if possible and, if unavoidable, the burden is on the Master to explain the absence of an attendant.  In fact, in treating a delirious patient, which poses more serious problems than treating a drunken one, it is flatly stated that "[i]f restraint is necessary * * * mechanical restraint may have to be used as a last resort." [35]

It is manifest that under the existing circumstances the Master did not exercise reasonable care for Cruz's safety.  The Master never considered use of oral sedation or less severe physical restraints, such as cloth or leather.  Neither food nor liquids nor any other ameliorative comforts often used in treating intoxicated persons was offered to plaintiff.

Having determined that the Master was negligent, consideration must now be given to whether the injuries sustained were proximately caused by this negligence and, if so, whether any amount awarded should be proportionately reduced because Cruz was intoxicated and therefore contributorily negligent.

Relevant authority suggests that reduced recovery would be improper in the instant suit.  Obviously, if the injuries sustained are caused solely by reason of a seaman's intoxication and not because of any fault of the shipowner, then recovery under the Jones Act must be denied.  Hermansen v. American-Hawaiian S.S. Co., 13 Misc.2d 373, 172 N.Y.S.2d 950 (Sup.Ct.1957).  Similarly, a seaman may not recover for damages caused by his own wilful intoxication.  For example, recovery was denied when an angry intoxicated seaman put his fist through a glass door.  Kontos v. S.S. Sophie C., 236 F.Supp. 664 (E.D.Pa.1964).  If, however, intoxication was a contributing cause of the injury sustained, then recovery should be reduced.  See Schlichter v. Port Arthur Towing Co., 288 F.2d 801 (5th Cir.), cert. denied, 368 U.S. 828, 82 S.Ct. 50, 7 L.Ed.2d 32 (1961).

In the instant suit, plaintiff's drunkenness neither caused nor contributed to his injuries.  Although his state of intoxication may have resulted from his prior negligence, it was the orders of the Master, acting independently and "with knowledge of this condition and in reference to it" which, in law, directly and proximately caused the fracture.  McDonough v. Buckeye S.S. Co., 103 F.Supp. 473, 477 (N.D.Ohio 1951), aff'd, 200 F.2d 558 (6th Cir. 1952), cert. denied, 345 U.S. 926, 73 S.Ct. 785, 97 L.Ed. 1357 (1953).  When the Master ordered plaintiff placed in irons he was obviously aware of his condition, since it was this condition which prompted the orders.  The direct cause of the injuries sustained, then, was not plaintiff's voluntary intoxication but his being shackled and thereafter left unattended while in this condition.

When a man is shackled by the wrists it is obviously foreseeable that he may injure his wrist.  There is sufficient evidence in the instant suit to sustain a finding that the restraints were competent to cause the injury sustained. [36]

Further, I find that the Master's unreasonable treatment of Cruz rendered the S.S. FLYING CLIPPER unseaworthy.  A seaworthy vessel requires a sound ship, proper gear and a competent crew, which, collectively, insure that the vessel be reasonably suited for its intended service.  Mitchell v. Trawler Racer Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960) ; Waldron v. Moore-McCormack Lines, Inc., 356 F.2d 247, 250 (2d Cir. 1966), rev'd on other grounds, 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967).

---

33.  Pg. 10.  *Id.*

34.  Pg. 11.  *Id.* at 288–90.

35.  Pg. 11.  *Id.* at 289.

36.  Pg. 13.  Tr. 208–09.

■■■ The Supreme Court has recently emphasized that unseaworthiness extends as much to the crew as it does to the vessel, and that the availability of safe and competent gear on a vessel will not prevent the use of defective gear from rendering the vessel unseaworthy. In addition, the Court flatly stated that the test of seaworthiness should be applied with reference to the time and place the gear is used. Waldron v. Moore-McCormack Lines, Inc., *supra*, 386 U.S. at 726, 727, 87 S.Ct. 1410; Mahnich v. Southern S.S. Co., 321 U.S. 96, 104, 64 S.Ct. 455, 88 L.Ed. 561 (1944). Therefore, applying the above principles to the instant case and even assuming that the S.S. FLYING CLIPPER's Master was reasonably competent, his unreasonable treatment of the intoxicated plaintiff rendered the vessel unseaworthy. That is, the clear and unequivocal language used and cited by the Court in *Waldron, supra,* compels the conclusion that the Master's treatment of Cruz rendered the vessel temporarily unseaworthy.

### Conclusions of Law

1. This Court has jurisdiction over the subject matter and parties to this action.

2. Plaintiff's injuries were proximately caused by the negligence of the defendant, in that the use of steel handcuffs to restrain plaintiff was an unreasonable use of force under the circumstances present herein which could foreseeably have resulted in injury to the plaintiff.

3. Further, defendant was negligent by not keeping plaintiff under more constant surveillance while manacled.

4. Defendant was also negligent in failing to consult and follow the acknowledged approved medical text issued by the United States Public Health Service in treating plaintiff.

5. Defendant's vessel was unseaworthy in that the Master's orders to place plaintiff in irons and shackle him to a bunk were unreasonable when given, and therefore rendered the vessel unseaworthy at that time.

As a result of defendant's negligence and the unseaworthiness of its vessel, plaintiff sustained an ununited displaced fracture of the left navicular bone, for which plaintiff is entitled to recover damages from the defendant in the amount of $9,000.00, which sum represents $5,977.39 [37] in lost wages and benefits and $3,022.61 for past and future pain and suffering.

Accordingly, the Court directs that judgment be entered for plaintiff in accordance with this opinion.

So ordered.

---

37. Plaintiff's lost wages were computed as follows: Plaintiff was disabled for about eight months and three days. His total wages for the first three quarters of 1965 were $5,414.68. (Plaintiff's Exh. 5 at 3.) His average earnings per month, therefore, were $601.63. His average earnings per day were about $30.76. (Plaintiff's Exhs. 5 at 3; 6.) This yields a total out-of-pocket loss of earnings for eight months and three days of $4,905.32.

His lost benefits were determined as follows: Plaintiff's Exhibit 6 reveals that in 1965 he worked an average of 19.5 days per month or about 58.7 days per quarter. Plaintiff's Exhibit 8 at 3 reveals that he is entitled to $2.77.5 per day plus 2.25 per cent of his total wages as contributions to the Union Pension and Welfare Plan. He is therefore entitled to 2.25 per cent of $4,905.32 plus $2.77.5 for 156.6 days, which equals $544.92. Further, he is entitled to five days of vacation benefits for each thirty days of employment. (Plaintiff's Exh. 8 at 5.) Thus, he is entitled to approximately twenty-five days of vacation benefits for the 156.6 days that he was projected to have worked, at a base pay of $392.58 per month. (Pre-trial order at 2.) His lost vacation benefits, therefore, equal approximately $327.15. His total lost benefits of $1,072.07, added to his lost wages of $4,905.32, equals a loss of earnings plus benefits of $5,977.39.