Dolores **BEDNAR**, Plaintiff,

v.

**UNITED STATES LINES, INC.,**
**Defendant.**

**No. C 70–940.**

United States District Court,
N. D. Ohio, E. D.

April 6, 1973.

**1314**

Laurence J. Hoch, Dworken, Bernstein & Hoch, Cleveland, Ohio, for plaintiff.

Thomas Coyne, Kirlin, Campbell & Keating, New York City, Lucian Y. Ray, Ray, Robinson, Keenen & Hanninen, Cleveland, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER

LAMBROS, District Judge.

This suit is brought pursuant to the Death on the High Seas Act, 46 U.S.C. §§ 761–767, and the Jones Act, 46 U.S.C. § 688, to recover for the death of Gerald Bednar, who disappeared at sea while on the crew of the S.S. American Challenger, a vessel owned and operated by defendant, United States Lines, Inc. Plaintiff, Dolores Bednar, seeks recovery as administratrix of the estate, widow, and mother of the two surviving children of Gerald Bednar. The matter was tried to the Court, after which the parties submitted posttrial memoranda.

## I. EVENTS PRECEDING PRESUMED DEATH

Since the claims in this case are based on the alleged negligence and unseaworthiness of the crew of the S.S. American Challenger, it is important to review the crew's knowledge of Gerald Bednar's mental condition and the crew's actions preceding his disappearance at sea on June 15, 1970.

Gerald Bednar had been employed by defendant since 1948 with an interval of unemployment due to psychiatric problems. In November, 1963, defendant reported difficulty sleeping and delusions while at sea. During 1964 he was treated institutionally in Staten Island, New York, and Fort Worth, Texas, for "psychotic depressive reaction" and "schizoid personality." On March 12, 1965, he resumed employment with defendant on the S.S. American Challenger. In June, 1970, he was employed as Second Mate on that vessel.

Several days prior to Bednar's disappearance he complained to the Chief Officer and Purser of marital problems and a failure to get mail at the last post. On June 12, 1970, he told that Master that he could not sleep and requested that he be relieved of his watch. He was given one half grain of sodium pentobarbital.

For the following two days Bednar performed his duties on the ship. However, on June 14, he reported that he could not sleep, that he was worried and that he thought other persons on the ship were talking about him. The Pur-

ser gave Bednar one grain of phenobarbital.

On June 15, while on the first watch, Bednar telephoned the Master and appeared to be suffering from delusions about conversations which did not occur. At 11:00 a.m., in the presence of the Master, Chief Officer and Purser, Bednar asked that his belongings be locked up and asked for medical help. Thereafter he was relieved of duties and sent to his room.

The Master sent a telegram to the U. S. Health Service, Honolulu, Hawaii, stating that Bednar had suffered from general malaise, insomnia, psychoneurotic disorder, acute anxiety, alienation, persecution complex, and delusions. The telegram added that Bednar had asked that his valuables be locked up, that he be relieved from duty and that he be given medical help. In the telegram the Master also explained that Bednar had a previous history of hospitalization for a like illness and listed the medical file number at Staten Island. The Health Service sent a reply telegram advising the crew to administer one grain of phenobarbital four times daily and to relieve Bednar of duties. It further advised:

> "Immediacy of further evaluation depends, largely on his behavior. If he remains calm without evidence of violence I see no reason why you should not proceed on original destination. If patient's behavior is such that it appears that he will do harm to himself or others would consider diversion for more immediate treatment. Please advise intentions and Honolulu Agent."

The crew then set up a schedule for administering the phenobarbital. However, at about noon when the Chief Officer went to Bednar's room, Bednar was wandering around the room nude and, according to the Chief Officer, appeared vague. The Chief Officer found Bednar writing a note which stated:

> "I shot and killed myself while playing with the Captain's revolver. I

shot and killed myself with Mr. King's revolver while playing with it."

The Master thereafter sent another telegram to the Health Services reciting these symptoms, stating that Bednar was under "constant observation," and asking whether the vessel should divert. The Health Services replied:

> "*If patient can be observed continuously* in order to prevent harm to self or others advise to continue to destination and further evaluation at Balboa for patient. Would increase phenobarbital to one and one half grains four times a day. Report condition in twenty four hours or sooner if deemed necessary." (Emphasis added.)

In spite of the Master's representation in the telegram that Bednar was under constant observation and the Health Service's admonition to keep Bednar under constant observation, the Master did not place Bednar under constant observation but arranged for such surveillance to begin at 5:00 p. m. Bednar's room was checked at about 1:30 p.m., when he appeared to be sleeping. At 2:00 p.m., when his room was checked again, he was discovered missing. The crew immediately searched the ship and began a sea search. They further reported to the Coast Guard which assisted in the search. However, the ship was about 1100 miles northwest of Honolulu and so, having not found Bednar by 10:00 a.m. on June 16, the S.S. American Challenger continued on course.

## II. NEGLIGENCE LIABILITY

■■ The shipowner and his agents have a duty to provide proper medical treatment and attendance for seamen suffering medical problems while in service of the ship. The Iroquois, 194 U.S. 240, 24 S.Ct. 640, 48 L.Ed. 955 (1904). When, therefore, the master and officers are or should be aware that a seaman is experiencing psychiatric difficulties or delirium and their failure to properly guard a man in his condition permits his injury, the shipowner is liable for the resulting damages. Whitak-

er v. Blidberg-Rothchild Co., 195 F. Supp. 420 (E.D.Va.1961), aff'd, 296 F. 2d 554 (4th Cir. 1961); Cruz v. American Export Isbrandtsen Lines, Inc., 310 F.Supp. 1364, 1367 (S.D.N.Y.1970). Since, however, the ship's master is not a physician, the courts have treated his duty as one dependent upon his knowledge of the seaman's condition and the medical advice available to him. The Iroquois, 194 U.S. 240, 243, 24 S.Ct. 640, 48 L.Ed. 955 (1904).

In this case, the ship's master and crew had adequate notice of Gerald Bednar's severe psychiatric problems. In the telegram to the Health Service on June 15, the Master described Bednar as suffering from a "psychoneurotic disorder", "delusions" and an illness like that for which he was hospitalized previously. If the Master had any remaining doubt that Bednar was not in a condition to properly care for himself at sea, it should certainly have been resolved when the Chief Officer found Bednar nude, "vague", and writing a confusing note about his own suicide. Thus, the situation presented is both one in which a reasonable man *should* have realized that Bednar was suffering from psychiatric problems and that this condition was serious and also one in which the communications sent by the crew showed that the crew was *actually aware* of this condition.

It is also clear from the facts presented that the crew was aware that a man in Bednar's condition should be placed under constant observation. As was proper, the Master telegrammed the closest United States Health Service for a recommended treatment. The advice given by the Health Service was that Bednar should be "observed continuously in order to prevent harm to self or others." It is obvious that the Master recognized this as the proper course of conduct because he telegrammed the Health Service about two hours prior to Bednar's disappearance falsely stating that Bednar was under "constant observation."

In defense of the Master's failure to order constant observation of Bednar, the defendant called a psychiatrist who testified that modern psychiatric thought was that a man with suicidal tendencies should not be locked up or treated in a degrading manner but that certain risks should be taken with such a person. Without presuming to deal with the merits of this current of thought, the Court finds that even if proper, it does not justify the crew's decision not to place Bednar under constant supervision. In this case, there were means to have prevented Bednar's disappearance without shackling him, locking him up, or using other degrading means of preventing harm to himself. The obvious method (and the one the Master planned to implement the night after Bednar disappeared) would have been to place a crewman outside his door to observe his movements should he decide to leave the room.

In summary, the situation presented is one in which the Master was aware of the severe psychiatric condition and suicidal note of Bednar and was aware that the proper course of conduct was one of constant observation. In that sense the Master's duty was clearer than the duty found in cases cited by plaintiff since in those cases the masters were limited to their own diagnosis and treatment recommendations. Whitaker v. Blidberg-Rothchild Co., 195 F.Supp. 420 (E.D.Va.1961), aff'd, 296 F.2d 554 (1961); Tetterton v. Arctic Tankers, 116 F.Supp. 429 (E.D.Pa. 1953); Batkiewicz v. Seas Shipping Co., Ltd., 66 F.Supp. 205 (S.D.N.Y. 1945); Reck v. Pacific-Atlantic S.S. Co., 180 F.2d 866 (2d Cir. 1950); Orona v. Isbrandtsen Co., 204 F.Supp. 777 (S.D.N.Y.1962), aff'd, 313 F.2d 241 (2d Cir. 1963). Furthermore, the duty was far clearer here than the duty in cases cited by defendant, since those cases involved deaths which were not preceded by severe psychiatric symptoms or which could not have been prevented through diligence. Smith v. Reinauer Oil Trans-

port, 256 F.2d 646 (1st Cir. 1958), cert. denied, 353 U.S. 889, 79 S.Ct. 133, 3 L.Ed.2d 117 (1958); Swain v. Mississippi Valley Barge Line Co., 244 F.2d 821 (3rd Cir. 1957), cert. denied, 355 U.S. 933, 78 S.Ct. 414, 2 L.Ed.2d 415 (1958). The result of the Master's failure to implement this medical advice was that Bednar left his room unnoticed and either inadvertently wandered off the ship in his "vague" state or jumped off the ship in an act of suicide. The shipowner is liable for the crew's negligence which contributed to the death of Gerald Bednar.

### III. UNSEAWORTHINESS LIABILITY

Plaintiff claims that the S.S. American Challenger was unseaworthy (1) because the vessel was within ten miles of a Coast Guard station and did not divert to obtain treatment for Gerald Bednar, (2) because the Master did not assign a crewman to supervise Gerald Bednar continuously and (3) because the Purser did not check the First Aid manual contained in the ship.

■ Claim (3) above is without merit. Rather than consulting a First Aid manual, the Master telegrammed for medical help. Consultation with the psychiatrists at the United States Health Service in Honolulu, who were trained and could review Gerald Bednar's medical file, was a far superior method to determine proper treatment than to have a layman consult a ship First Aid manual and attempt to apply its general provisions to the symptoms displayed. Thus, the failure to consult the manual did not constitute unseaworthiness.

■ The Court can grant relief for unseaworthiness for the first two reasons advanced only if the Supreme Court's decision in Waldron v. Moore-McCormack Lines, 386 U.S. 724, 87 S. Ct. 1410, 18 L.Ed.2d 482 (1967), is given an unduly expansive reading. In that case, the Court determined that plaintiff's claim that an insufficient number of persons were assigned to uncoiling a heavy rope should have been submitted to the jury under an unseaworthiness theory. *Id.* 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d at 486. The Court related the failure to assign personnel to the classic definition that a vessel was unseaworthy when insufficiently or defectively equipped on the grounds that the failure to assign sufficient persons had resulted in a misuse of the ship's gear in that case. *Id.* 386 U. S. 724, 87 S.Ct. 1410, 18 L.Ed.2d at 485, 486. In this case, however, the Master's decisions as to medical care and supervision were unrelated to the work or gear of the ship. To grant relief under the theory of unseaworthiness in this case would be to hold that unseaworthiness and negligence are equivalent theories, a holding which would be far broader than that announced by the Court in *Waldron*.

The plaintiffs urge the Court, however, to adopt the reasoning of the District Court in Cruz v. American Export Isbrandtsen Lines, Inc., 310 F.Supp. 1364 (S.D.N.Y.1970). In *Cruz* the shipowner was held liable under an unseaworthiness cause of action for the injuries to a seaman who was manacled while inebriated. It is unclear from the opinion what behavior was held to constitute unseaworthiness since the shipowner was alternatively held liable for negligence. However, to the extent that the ruling in *Cruz* was that the negligence of the crew, when unrelated to the ship's gear or work, makes the vessel unseaworthy, the Court declines to follow it. The Court will grant no relief under plaintiff's claim that the vessel is unseaworthy.

### IV. DAMAGES

Plaintiff seeks $202,000 in damages for pecuniary loss suffered by Gerald Bednar's dependents, for pain and suffering, for interest, for costs and for attorneys fees. Each of these elements involves complicated factual determinations by the Court.

**1318**

Pecuniary loss is measured by the actual loss suffered by his wife and two children. In this case the pecuniary loss is difficult to ascertain, because Gerald Bednar's need for psychiatric treatment might have reduced his income, because his psychiatric problems might have shortened his life and thus earning power, and because the difficulties in the marriage between Gerald Bednar and plaintiff create doubt about the amount the wife and children would have received from Gerald Bednar's earnings. *See* Whitaker v. Blidberg-Rothchild Co., 296 F.2d 554, 555 (4th Cir. 1961); Lange v. United States, 179 F.Supp. 777, 779, 780 (N.D.N.Y.1960); Tetterton v. Arctic Tankers, 116 F.Supp. 429, 432 (E. D.Pa.1953).

The average life expectancy for a man who was age 43 in 1970 was 31.3 years. However, because Gerald Bednar had a history of alcoholism, of psychiatric hospitalization, and of suicidal tendencies, the Court finds that his reasonable life expectancy was 10 years.

To determine the amount of support given to plaintiff and her two children during the ten year life expectancy, the Court must review the marriage circumstances. At the time of Gerald Bednar's death, he had been married to Dolores Bednar for ten years and had two children, aged nine and eleven. As the result of marital difficulties and a deterioration in Gerald Bednar's medical condition, on February 16, 1970, Dolores Bednar obtained a support decree for herself and the children of $600 per month. A review of the testimony regarding the marriage indicates that plaintiff's support probably would have exceeded that by only a small amount had Gerald Bednar not died.

A further question in regard to pecuniary loss is whether Gerald Bednar could have earned enough in the ten remaining years of his life to have honored the $600 per month support decree. For the years 1966 through 1969, Gerald Bednar reported salaries of $14,465, $13,993, $17,107 and $21,825. However, considering his mental condition prior to death and his history of alcoholism, it is likely that he would have been hospitalized for part of his life, thus posing a financial liability rather than a financial benefit for his family for that period. Still, the Court finds that he could have honored the support decree.

In fixing the award for pecuniary damages, the plaintiff is not entitled to prejudgment interest. Petition of United States Steel Corp. 436 F.2d 1256, 1279 (6th Cir. 1970); Doucet v. Wheless Drilling Co., 467 F.2d 336, 340 (5th Cir. 1972). The amount awarded should be discounted, however, for future interest.[1] *Id.* Upon consideration of all these factors, the Court awards $20,000 to Dolores Bednar, as guardian for Gerald Bednar Jr.; $20,000 to Dolores Bednar, as guardian for Christopher Bednar; and $20,000 to Dolores Bednar.

Because there is no evidence that Gerald Bednar underwent physical pain and suffering prior to his death, the Court declines to award damages to the Estate of Gerald Bednar. Petition of United States Steel Corp., 436 F.2d 1256, 1275, 1276 (6th Cir. 1970); Cleveland Tankers, Inc. v. Tierney, 169 F.2d 622, 626 (6th Cir. 1948). Furthermore, there was present no loss of companionship and guidance such as could be considered in pecuniary damages. United States Steel, *supra* 436 F.2d at 1276. The Court finds no basis for an award of attorneys fees against defendant.

It is so ordered.

---

1. The experts at trial testified that interest rates from 4½ to 6 per cent would be reasonable. On the basis of their testimony the Court concludes that a rate of 5 per cent would be proper. The Court finds that the total pecuniary damages are slightly in excess of $72,000 over a ten year period. The interest rate of 5 per cent is applied only to that portion of the damages which will be incurred for the 7 years commencing at the time of judgment. Through this process, the Court arrived at a present value for the award of $60,000.