Joseph James CARLENO, Appellant,

v.

MARINE TRANSPORT LINES, INC. and United States of America, Appellees.

No. 8907.

United States Court of Appeals
Fourth Circuit.

Argued March 27, 1963.

Decided May 15, 1963.

Jacob Rassner, New York City (Israel Steingold, Norfolk, Va., on brief), for appellant.

Charles R. Dalton, Jr., and Robert M. Hughes, III, Norfolk, Va. (C. V. Spratley, Jr., U. S. Atty., and Seawell, McCoy, Winston & Dalton, Norfolk, Va., on brief), for appellees.

Before SOBELOFF, Chief Judge, and BRYAN and BELL, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge.

These maritime torts and broken obligations were laid by the libel of boatswain Carleno to the Marine Transport Lines, Inc. and the United States, respectively operator and owner of the tanker USNS Muir Woods, on which he was serving: (1) injury to his heart from overexertion forced upon him through unseaworthiness of the vessel and the negligence of her officers, (2) aggravation of the injury through failure to furnish adequate medical attention, and (3) untimely termination of his maintenance and cure. His claims denied by the District Court, he now appeals; but we likewise see no merit in his case.

Passing the pre-voyage physical examination, Carleno signed on the Muir Woods at Norfolk, Virginia, May 13, 1958 and sailed as boatswain. Preparatory to taking on a cargo of fuel oil in the Dutch West Indies for discharge ulti-

mately to a Navy fleet oiler at sea off Lisbon, Portugal, the Muir Woods proceeded to a shipyard in Savannah, Georgia for installation of a "fueling at sea" rig. This consisted, among other items, of four additional manifolds and four nylon hoses. On June 8, 1958, the Muir Woods headed for Aruba, one of the Lesser Antilles, in the Carribbean, just north from Venezuela. En route Carleno was ordered to lay out the hoses and secure them to the new manifolds. The hoses had been stowed on the crossbeams of the spar deck, immediately above and open to the main deck where the connections were to be made. While the hoses were for off-loading only, the master with seamanlike forethought preferred to rig them to the manifolds before loading fuel oil. The metal flanges of the hoses when dragged over the steel deck, he feared, might create friction imperiling a cargo not entirely "gas-free".

With preliminary steps for running and fitting the hoses completed on June 10, bo'sun Carleno with six crewmen turned to at one o'clock on the afternoon of June 11 and by five the trick with the hoses was finished. At intervals Carleno took a hand in the work, but for the most part he was simply "overseeing" the gang, the customary function of a boatswain. His previous daily occupation had been confined to touring the ship.

Off duty after supper, he volunteered to help set things to rights in a deck locker—at over-time compensation for some three hours. About 9 o'clock he turned in for the night. Although he may have been ill then, it is certain that around 4:30 A.M. he had sharp chest pains, active nausea, chills and profuse perspiration. Immediately he went to the purser's office for aid. The purser, who was also shipboard medical advisor, sent him back to his quarters, where shortly he diagnosed Carleno's suffering as a respiratory infection. Given terramycin, he was ordered by the purser to stay abed until after the ship docked that morning in Aruba at San Nicolas.

Returning again to Carleno's cabin before breakfast, the purser found it empty and the patient sitting in the mess room drinking coffee. The bo'sun said he felt a "lot better". A medical service request was made out for him to take to the ship's agent, not far from where the vessel was docked. Afterwards, with a shipmate he walked to the physician's office about a mile away. The doctor thought his sickness a kidney ailment. Except for a walk of two city blocks, he came back to the ship in a cab. By the same means he was then sent to the San Pedro DiVerano Hospital. There his trouble was determined to be a heart attack.

Hospitalized in San Nicolas until June 28, on that day he was flown to New York for a stay of a week in the Public Health Service Hospital. Then he returned to Norfolk, where he received outpatient attention at the Marine Hospital.

"Fit for duty" was noted on his discharge from the Norfolk hospital December 18, 1958. The Spring of 1959 found him again as bo'sun on the Muir Woods, serving for four or five weeks until the ship was "laid up". Later in 1959 he shipped foreign on another vessel for approximately 50 days as an ordinary seaman. In 1960 he did two round voyages as boatswain on still another transocean vessel for a total of 6 months. Since his last crossing in 1960, he has been kept ashore by his heart condition.

Upon these findings—generously supported by the evidence—the District Judge concluded there was no unseaworthiness in the Muir Woods, no neglect of Carleno, and no maintenance and cure due him beyond December 18, 1958, the date on which he was both fit for duty and had received the maximum cure possible for him.

The unseaworthiness charged in the libel—that the appliances and the manpower furnished were so inadequate he had to exert himself above his strength and so injured his heart—was completely refuted by the overwhelming proof of the good supply and condition of falls, winches and other deck appur-

tenances which were suitable, if needed, for lowering and laying out the hoses. There were also two booms available though not used because not readied. But if none of this equipment was employed, the evidence still fails to sustain the accusation of unseaworthiness. The length and weight of each section of the nylon hose was approximately 25 feet and 200 pounds. Six crewmen were there to handle the hoses, and the testimony is that three or four could easily move a section into place. Thus the turn was not undermanned, and the boatswain was not overtaxed even if he did occasionally spell the men.

■ Recovery for negligence here is premised on both the general maritime law and the Jones Act.[1] The allegation—which may also relate to unseaworthiness as well—is lack of worthwhile medical attention on board and in port. A ship's doctor or surgeon in the ship's complement is not required, libelant-appellant concedes, by law, custom or usage in order to meet the standards of good shipkeeping. De Zon v. American President Lines, Ltd., 318 U.S. 660, 668, 63 S.Ct. 814, 87 L.Ed. 1065 (1943); The Iroquois, 194 U.S. 240, 242, 24 S.Ct. 640, 48 L.Ed. 955 (1904); The Wensleydale, 41 F. 602 (E.D.N.Y.1890).

■ Nothing in the record suggests a want of care in selecting the purser, or rates his medical assistance below that prevalent on freighters generally. His misreading of the signs of Carleno's pain did not prove him unqualified. This holds true, too, for the physician in San Nicolas. Scarcely any surgeon, physician or dentist, we surmise, could satisfy such a test. Neither purser nor physician acted carelessly. Not until Carleno's conduct and words assured the purser of his improvement did he acquiesce in the patient's going ashore. Promptly upon his first examination the doctor advised the ship to hospitalize Carleno. The walk to the physician's office may have been harmful. But it

was permitted only after the purser had diligently sought to know and safeguard Carleno's condition. No neglect is evinced here.

The upshot was that the District Court was unpersuaded—and quite understandably—either that the heart attack was brought on through any delinquency of the ship, her officers or her agent, or that any of them was inattentive to the bo'sun. The only remaining question is whether maintenance and cure was unjustly abridged.

■ Maintenance and cure is a seaman's security from the time he is articled. Not dependent upon negligence, unseaworthiness or other things left undone, the doctrine has been so clearly traced and forcefully enunciated from the time of the Black Book of the Admiralty and earlier, that now it would be supererogation to attempt a dissertation upon the principle. Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949). But there is still the difficulty of adjusting its duration.

■■ With the District Judge, we think the evidence warranted an end to Carleno's allowance on December 18, 1958. Of course, the certification of his capability as of that date is not conclusive. But it is a consideration of quite some import. Especially when within a few months and for the next two years he ships in the rugged service of an ordinary sailor as well as in the less rigorous life of a bo'sun. Additionally, there is acceptable expert testimony that he had by that date "achieved maximum benefit at that time available" of medical treatment. It is imperative to be mindful that the defendants did not inflict or aggravate the heart impairment; hence the period of maintenance and cure is not to be extended beyond the point of maximum recovery merely because the impairment remains. The obligation is fulfilled when subsistence and medical care are furnished to the point where remedial medicine and surgery can do

1. 46 U.S.C. § 688, made applicable to the United States by Suits in Admiralty Act and Public Vessels Act, 46 U.S.C. §§ 742, 781.

no more. Farrell v. United States, supra, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850; see Morewitz v. S.S. Matador, 306 F.2d 144, 147 (4 Cir. 1962).

Sound and fair, the judgment of the District Court will be affirmed.

Affirmed.