**Curman DICKENS, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 2:92CV77.**

United States District Court
E.D. Virginia,
Norfolk Division.

March 18, 1993.

---

---

Arthur C. Ermlich, P.C., Virginia Beach, VA, for Curman Dickens.

George M. Kelley, III, Asst. U.S. Atty., Norfolk, VA, John T. Adrian, Trial Atty., Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, DC for U.S.

## MEMORANDUM OPINION AND ORDER

PAYNE, District Judge.

This personal injury action is brought by Curman Dickens ("Dickens") against the United States of America (the "United States"). It arises out of the operation of the M/V CAPE FAREWELL (sometimes referred to as the "Vessel") which is owned and operated by the United States Maritime Administration ("MARAD"), a branch of the United States Department of Transportation. Dickens alleges that, as a consequence of the defendant's negligence and the unseaworthiness of the Vessel, he aggravated a pre-existing ankle injury while working aboard the Vessel when she was in the North Sea en route to Bremerhaven, Germany from Saudi Arabia. The court has jurisdiction under the Suits in Admiralty Act, 46 U.S.C.App. § 741, *et seq.*

The action was tried to the court without a jury. The negligence claim was dismissed at trial on the United States' motion for judgment as a matter of law because Dickens failed to present any evidence of negligence. The parties have submitted proposed findings of fact and conclusions of law on the unseaworthiness claim, and they have argued their positions orally.

For the reasons explained below, the court finds that Dickens has failed to establish that the Vessel was unseaworthy or that his alleged injuries were proximately caused by the unseaworthy condition Dickens alleges to have existed. Accordingly, judgment will be entered in favor of the United States.

### STATEMENT OF FACTS

Dickens signed aboard the M/V CAPE FAREWELL in August 1990 as an ordinary seaman. At the time, there was an increased demand for shipping and seamen as a consequence of the invasion of Kuwait by Iraq. The Vessel, which was part of the Ready Reserve Fleet and under contract to MARAD, was activated in August 1990 to help meet this increased demand. Crewmen were in short supply and Dickens, who had a pre-existing limitation because of a previous, serious and incompletely healed injury to his ankle and who had failed the physical examination required by the Seafarer's International Union in November 1989 because of a weight problem, was hired without having to take another examination. Dickens had limited experience as a crewman, and this voyage was his first deep sea or "blue water" experience. Dickens worked hard, however, and during the voyage he was promoted to able bodied seaman ("AB") in the M/V CAPE FAREWELL's deck department.

Dickens alleges that he was injured while he and James Deano, another AB, were flaking the mooring lines on the morning of January 30, 1990, the day before the Vessel was to make a scheduled port call in Bremerhaven. "Flaking the lines" is the process of removing the mooring lines from the hold (where they are stowed to protect them from the elements and the risk of being washed overboard) and placing them on deck in parallel rows so they will be readily available to secure the ship upon docking.

The first step in this process on the M/V CAPE FAREWELL was to wrap the line around a motorized capstan which, when in operation, pulled the line from the hold and fed it onto the deck. The customary practice called for the Bosun to man the capstan to control the speed at which the mooring line was fed from the hold onto the deck.[1] Then, as the line left the capstan, a crewman would grasp it and walk backwards laying the line on the deck in lengths of parallel rows each approximately 30 feet long.

Dickens' theory of recovery is that the Vessel was unseaworthy on January 30, 1990 because he was required to flake the lines with a complement of crew inadequate to perform the task safely. This lack of manpower, according to Dickens, was the proximate cause of injury and, indeed, is the "real issue of the present case." (Dickens Post–Trial Brief, p. 3).[2]

---

1. The Vessel's capstan had two forward speeds, low and high, which were controlled manually through the use of a handle.

2. Dickens also contends that the Vessel was unseaworthy because there was alcohol on board. Dickens failed to present any probative evidence which could establish that the presence of alco-

The United States first contends that there was no accident and that, in fact, Dickens fabricated the alleged accident and injury to secure insurance benefits for treatment of the pre-existing injury to his ankle which had never healed properly. There was substantial evidence at trial to support this theory. The United States also contends that Dickens' accident on January 30, if there actually was one, did not worsen his pre-existing condition. There also was substantial credible evidence to support this defense. Indeed, the United States offered evidence that, as of the time of trial, the condition of Dickens' ankle was better than it was when he began working on the Vessel. However, the court finds it unnecessary to reach either of those defenses because, as discussed below, the evidence presented by Dickens does not establish unseaworthiness which is the predicate to his right to recovery.

It is undisputed that on the evening of January 29, Richard DeMont, the First Mate, instructed the Bosun that the mooring lines were to be flaked the next day because the Vessel was scheduled to make port at Bremerhaven on January 31. DeMont, however, did not recall directing the Bosun to flake the lines at 0800 the next morning, and he further testified that there was no urgency to flaking the lines early on January 30 because the Vessel was not due in port until sometime on January 31. DeMont explained that, although flaking the lines was one of the tasks to be accomplished on January 30, the Bosun, who supervised the deck department, was responsible for allocating the work to be done by its members on that day and for determining the priority of the work to be done on that day and generally.

After instructing the Bosun on what was to be done on January 30, DeMont left orders for the Third Mate on the 0400 to 0800 watch to have a member of the deck department give a wake up call at 0720 for "all hands to turn to at 0800." According to DeMont, a "turn to" order customarily meant that the

deck crew was to meet either in the mess hall or outside the Bosun's room. The Bosun then would instruct the crew on the tasks to be performed as well as the order in which they were to be performed. Although Dickens said that it was not common to muster at the galley he agreed that, following a muster call, the Bosun would direct what work the deck department was to do and the order in which it was to be done.

According to Dickens, the Third Mate on the 0400 to 0800 watch instructed him to wake the other members of the deck department at 0720 with instructions to muster at 0800. Dickens complied with that order by knocking on the doors of the cabins occupied by the deck department crew and telling them to turn to at 0800. Dickens said that he received a response from every cabin. At 0800 he went to the bow of the Vessel expecting to find the other members of the deck department, but only James Deano was present.

Deano testified that on January 30 he received a wake up call at 0720 with instructions to be at the bow at 0800. During cross-examination, he also testified that on the previous day (January 29) DeMont had given an order that all hands were to pull lines at 0800, but that there was no instruction on where to report. Also on cross-examination, Deano said that the order he received on the morning of January 30 was for all hands to turn-to on deck by 0800.

In any event, Deano went to the bow at 0800, where he encountered only Dickens. After waiting approximately 15 to 20 minutes, Deano left Dickens at the bow and undertook a brief and unsuccessful search of the Vessel for the other members of the deck department. The evidence establishes that, at this point, Dickens and Deano chose to proceed with the task of pulling and flaking the mooring lines without waiting for further assistance.[3]

Deano did not offer evidence as to the number of crewmen needed to safely perform

---

hol on the Vessel played even the slightest role in his alleged injury, let alone that the presence of alcohol was a "substantial factor" in causing his injuries. *McClow v. Warrior & Gulf Nav. Co.,* 842 F.2d 1250 (11th Cir.1988).

3. Dickens testified that the two of them "elected" to proceed with the job of flaking out the lines, while Deano testified that they "opted" to proceed.

the flaking operation. However, he testified that the usual procedure called for six men in addition to the Bosun. Dickens testified that he would not have been required to handle as much line or to walk backwards with the line if there had been five or six other people to help with the job and that, in his view, it was safer to have a crew of five or six.

DeMont was the only other witness to offer testimony on the number of crewmen required to safely flake the lines on the M/V CAPE FAREWELL. He explained that, although no specific number of crew was required to perform the task, it was easier if all members of the deck department were involved. In DeMont's judgment, however, the ideal crew to perform the job was four or five: one person to operate the capstan; two people on deck flaking the lines; and one or two people below deck to assure that the line pays out freely from the hold. DeMont also expressed the view that it would not be safe to have more than two people on deck flaking the lines because there was insufficient deck space to allow for proper placement of the lines on the deck and for safe movement of the crew members.

Although the record is inconclusive respecting the minimum number of crewmen needed to safely perform the flaking operation, neither side contends that the task could be accomplished safely by two people. Nor is there any serious doubt from the record that Dickens and Deano knew that it was unsafe for just the two of them to proceed with the task. Both knew that the usual procedure required more than two people, and both knew that one person was required to operate the capstan winch.

Deano explained that he "opted" to proceed without the full complement of crew needed for the job because he understood that "an order is an order" and the job was to be done even in the absence of the usual number of crew members. Dickens said that he elected to proceed with the task because he understood that he was under order to begin flaking out the mooring lines at 0800. Neither Dickens nor Deano identified any superior who ordered them to proceed in the absence of a full complement of crew, nor did either of them testify that they or anyone else had been required previously to perform the job with a crew inadequate for the task.

In sum, the record is that Dickens and Deano, on their own initiative, began flaking the lines without waiting for assistance. To this end Dickens and Deano wrapped the line around the capstan; activated the motorized capstan on the slow speed; and wedged the control handle (a so-called "deadman's handle") open with a piece of rope.[4] Thus, the record establishes that on the morning of January 30, 1990 Dickens and Deano elected to proceed with the task by themselves, knowing that they were doing so in an unsafe way, in a fashion not customarily used, and with less than the complement of crew customarily used to perform the task. Moreover, no witness identified any direct or standing order, established procedure or past practice which required that Dickens and Deano undertake the job alone.

According to Dickens, his injury occurred after he and Deano had flaked approximately 10 to 12 lengths of line onto the deck. Deano testified that they had only flaked approximately 5 lengths. Dickens says that he was preparing to flake out another length, he grabbed a "bite" of the line at the capstan and started to walk the line backwards while laying it on deck and that, as he was walking backwards with his right foot on a length of previously flaked line, he slipped off the line and twisted his ankle, thereby aggravating his pre-existing injury.[5]

## DISCUSSION

 The doctrine of seaworthiness is a doctrine of liability without fault. *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 94, 66 S.Ct. 872, 877, 90 L.Ed. 1099 (1946). It imposes upon a shipowner an absolute and nondelega-

---

4. There is no evidence that any superior ordered or condoned this unsafe practice, or that it had been used in the past. Moreover, Deano testified that the usual procedure was for the Bosun to operate the capstan winch.

5. Dickens testified on direct examination that he would have been walking with his foot on the previously-laid line even if a full complement of crew had been present.

ble duty to supply a seaworthy vessel and appurtenances that are reasonably safe and fit for their intended use. *Id.* at 94–95 n. 11, 66 S.Ct. at 877 n. 11. "The standard is not perfection, but reasonable fitness: not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suited for her intended service." *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960). It is settled that the seaworthiness doctrine "extends not only to the vessel but to the crew." *Crumady v. J.H. Fisser,* 358 U.S. 423, 427, 79 S.Ct. 445, 447, 3 L.Ed.2d 413 (1959). *Accord Waldron v. Moore–McCormack Lines, Inc.,* 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967). An improperly manned vessel is unseaworthy as a matter of law, *see, e.g., Thezan v. Maritime Overseas Corp.,* 708 F.2d 175, 179 (5th Cir.1983), *cert. denied,* 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984); *Comeaux v. T.C. James & Co., Inc.,* 666 F.2d 294, 299 (5th Cir.1982), as is a vessel with an adequate overall crew but too few crewmembers assigned to a given task. *See, e.g., American President Lines, Ltd. v. Welch,* 377 F.2d 501 (9th Cir.), *cert. denied,* 389 U.S. 940, 88 S.Ct. 294, 19 L.Ed.2d 292 (1967); *American President Lines, Ltd. v. Redfern,* 345 F.2d 629 (9th Cir.1965). *Cf. Skandalis v. M/V GALINI,* 1974 A.M.C. 1671 (E.D.Va.1974).

■ Although the doctrine of unseaworthiness imposes liability without fault, the plaintiff must show that the alleged unseaworthy condition proximately caused his injury. Put another way, proof of causation in seaworthiness cases:

> requires a showing of "proximate cause in the traditional sense." Proximate cause means that (1) the unseaworthiness played a substantial part in bringing about or actually causing the injury and that (2) the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.

T. Shoenbaum, *Admiralty and Maritime Law* § 5–3, p. 167 (West 1987). *See also McClow v. Warrior & Gulf Nav. Co.,* 842

F.2d 1250 (11th Cir.1988) (the substantial factor test applies to causation questions in unseaworthiness cases).

■ At trial and in his post-trial brief Dickens alleged, not that the Vessel as a whole was inadequately manned, but that it was temporarily unseaworthy because an inadequate number of crewmen were assigned to perform the task of flaking out the mooring lines on the morning of January 30, 1990. To prevail on his claim of temporary unseaworthiness, Dickens was required to show that he was ordered to perform the task without adequate assistance. *See, e.g., Waldron v. Moore–McCormack Lines, Inc.,* 386 U.S. 724, 727, 87 S.Ct. 1410, 1412, 18 L.Ed.2d 482 (1967); *Moschi v. Steamship Edgar F. Luckenbach,* 424 F.2d 1060 (5th Cir.1970) (where plaintiff was ordered to complete a two-person job alone, recovery for unseaworthiness allowed); *American President Lines, Ltd. v. Welch,* 377 F.2d 501 (9th Cir.1967) (same). *Cf. Lyons v. Ohio River Sand & Gravel Co.,* 683 F.2d 99, 100–101 (4th Cir. 1982) (where evidence did not establish that seaman was ordered to pick up a shaker plate without assistance, seaman failed to establish that the vessel's crew was inadequate to perform the task); *Carleno v. Marine Transport Lines, Inc.,* 317 F.2d 662, 664–65 (4th Cir.) (where bosun's assigned task was not undermanned, no recovery for unseaworthiness allowed), *cert. denied,* 375 U.S. 896, 84 S.Ct. 173, 11 L.Ed.2d 125 (1963); *Skandalis v. M/V GALINI,* 1974 A.M.C. 1671 (E.D.Va.1974).

■ Dickens was also required to show that the inadequacy of the number of crewmen assigned to the task was the proximate cause of his alleged injury. In that regard, it is the general rule in unseaworthiness cases that a seaman's own negligence will not defeat his right to recovery. *Sieracki,* 328 U.S. at 94 n. 11, 66 S.Ct. at 877 n. 11.[6] However, narrow exceptions to this rule exist in situations where the unseaworthy condition is "*entirely* [the seaman's] own fault," *Valm v. Hercules Fish Prod., Inc.,* 701 F.2d 235, 236 (1st Cir.1983) (emphasis in original), or

***

6. Rather, the seaman's recovery is generally reduced to the extent that his negligence contribut- ed to cause his injury. *Id.*

where the injury results from the "negligent use of an otherwise seaworthy vessel." *Peymann v. Perini Corp.*, 507 F.2d 1318, 1322 (1st Cir.1974), *cert. denied*, 421 U.S. 914, 95 S.Ct. 1572, 43 L.Ed.2d 780 (1975). In these limited circumstances, the seaman's negligence will bar any recovery. *Valm*, 701 F.2d at 236; *Peymann*, 507 F.2d at 1322. *See also Williams v. S.S. Richard de Larrinaga*, 287 F.2d 732, 735 (4th Cir.1961) (where seaman's own actions are the sole cause of his injuries he cannot recover).

■■■ Based on the evidence presented at trial, the court finds that: (1) Dickens failed to prove that the M/V CAPE FAREWELL was unseaworthy because he failed to establish that he was ordered to flake the mooring lines with inadequate assistance; and (2) Dickens was injured, if at all, as a consequence of his negligent use of an otherwise seaworthy vessel.

As outlined fully above, there was no definitive evidence adduced at trial respecting the number of crewmembers required to safely perform the task of flaking the mooring lines on the M/V CAPE FAREWELL. However, considering DeMont's testimony that the ideal procedure was to have a crew of not less than four, and that Dickens and Deano considered the usual complement to be either six or seven, the record permits the conclusion that a complement of four to seven men would have been adequate to safely perform the task during which Dickens claims to have been injured. Accordingly, if Dickens had been ordered to flake the mooring lines with a crew of less than four, his claim of unseaworthiness would be established. *See, e.g., Moschi*, 424 F.2d at 1061; *Welch*, 377 F.2d at 504; *Carleno*, 317 F.2d at 664–65.

That, however, is not what occurred here. There is no evidence that anyone ordered Dickens and Deano to proceed with the task with an inadequate crew. At best, Dickens has shown that he and Deano understood that they were to muster on the bow at 0800

on January 30 for the purpose of flaking the lines. However, DeMont's testimony establishes, and Dickens admits, that it was up to the Bosun to decide the order of work. No witness testified that the Bosun told Dickens and Deano to proceed on their own, nor is there proof of a standing order that required Dickens and Deano to proceed with the task unassisted.[7]

■■■ It is not to be presumed that the officers of a ship expect the crew to perform jobs in an unsafe manner or that crew members will be disciplined for refusing to undertake a task they know to be unsafe and in a manner which violates the procedures customarily followed aboard a vessel. This is particularly so where, as here, there was obviously no emergency dictating a need to proceed with less than a full and safe complement of crew. Moreover, the record contains no evidence whatsoever from which the court can conclude that Dickens and Deano risked discipline, much less punishment, if they had but waited or embarked upon a serious search for the other members of the deck department.

## CONCLUSION

For the foregoing reasons, the court concludes that Dickens failed to establish the unseaworthy condition on which he predicated his claim. Furthermore, the court concludes that, even if Dickens was injured, it was entirely as a consequence of his own negligent conduct in undertaking the task with fewer than the customary complement of crew. Accordingly, Dickens is barred from any recovery in this case and judgment will be entered in favor of the United States.

It is so ORDERED.

---

7. Given its best light, Dickens' evidence is that he and Deano had a subjective impression that they were to proceed with the job at 0800, even though they knew it to be unsafe, because orders had been given for the deck department to muster on deck at 0800 for the purpose of flaking the lines. Even if one accepts that Dickens and Deano understood the order to have been "muster on the bow at 0800 for the purpose of flaking the lines," which the court does not, that does not constitute an order to proceed without regard to the size of the crew available to do the job.